# EXHIBIT A

## Allman & Petersen Economics, LLC

7677 Oakport Street, Suite 610          **Phillip H. Allman, Ph.D.**
Oakland, CA 94621          **Jeffrey S. Petersen, Ph.D.**
(510) 382-1550
(510) 382-1472 (FAX)          **www.allmaneconomics.com**

Amy Hamm and Joye Wilson, et al. v.
Acadia Laplace Holdings, LLC and Ochscner-Acadia, LLC
United States District Court
Eastern District of Lousiana
Case No.: 20-1515 Section "E"

February 8, 2024

Fed. R. Civ. P. 26(a)(2)(B) Report of Plaintiffs' Survey and Statistical
Expert for Class Certification

## I.  Assignment and Summary of Conclusions

### *Assignment*

1.  I have been retained by Schneider Wallace Cottrell Konecky, LLC in *Amy Hamm and Joye Wilson, et al. v. Acadia Laplace Holdings, LLC and Ochscner-Acadia, LLC* (hereafter "this matter") to assess whether a survey will provide valid and reliable data regarding the frequency and duration of off-the-clock/unpaid work during meal periods.

### *Summary of Conclusions*

2.  The responses to survey questions will assist the trier-of-fact in making liability and damages determinations regarding unpaid wages due to class members for work being performed off-the-clock during meal periods.  The survey questions will conform to the U.S. Supreme Court ruling in *Tyson Foods, Inc. v. Bouaphakeo*[1] since individual class members would present answers to

---

[1] 577 U.S. 136 S. Ct. 1036; 194 L. Ed. 2d 124

these questions to establish liability and damages if they filed a lawsuit regarding their individual claim.  The survey responses will show the following information regarding the class period:

- the percentage of class members that performed off-the-clock/unpaid work during meal periods due to being on-call,

- the percentage of class members that performed off-the-clock/unpaid work due to meal periods being interrupted by work requirements,

- the percentage of shifts where off-the-clock/unpaid work was performed during meal periods due to being on-call or subject to interruption,

- the percentage of shifts where off-the-clock/unpaid work was performed due to meal periods being interrupted by work-requirements,

- the average duration of off-the-clock/unpaid work when meal periods were interrupted by work requirements.

3.  It is my understanding that the proposed class has approximately 567 putative members that are current and former hourly patient care employees for Defendants at Riverplace Behavioral Health.  The survey respondents will be selected from this population and will be questioned about their employment period at Riverplace Behaviorial Health.[2]  I have previously collaborated with Davis Research on sixteen surveys in wage and hour cases.  Four of these surveys involved off-the-clock work time and seven surveys involved break periods that were interrupted or on-call.  The targeted number of survey respondents for this matter will be determined following the pilot study.  The pilot study will be conducted on 40 randomly selected putative class members

---

[2] It is my understanding that the class period predates the opening of the facility, therefore all patient care employees are class members and all there employment periods are within the class period.

and is utilized to determine the full sample size for the survey to achieve the desired margin of error.

4. A survey provides an efficient manner for gathering data in this matter. I have developed a method for conducting surveys in class action wage and hour cases that blends peer-reviewed survey science and my unique experience as a damages expert in individual wage and hour cases. I have used this survey methodology in other class action wage and hour cases to obtain valid and reliable survey responses. In the matter of *Aldapa v. Fowler Packing,*[3] I conducted a survey regarding the frequency and duration of pre-shift and post-shift off-the-clock work time. The survey participants were farm workers that performed piece-rate work that involved picking fruit. During the first four years and seven months of the class period, the class members were only paid for the actual pieces of fruit they picked but they were also required to perform pre-shift, mid-shift, and post-shift work related to their picking (hereafter "non-productive time"), for which they were not compensated. This changed in November 2015. The class members still had to perform non-productive work but they began being paid for this work time and it was documented in a payroll code titled "non-productive time." The class period ended in June 2018, so there were two years and eight months of payroll data for the non-productive time. The survey participants were asked to estimate their pre-shift, mid-shift and post-shift non-productive time during the entire class period. The average of their estimates was 38.4 minutes. The payroll data showed an average of 39.2 minutes. <u>Therefore, the survey responses regarding off-the-clock work time were almost exactly equivalent to the actual data.</u>[4]

---

[3] *Beatrice Aldapa et al. v. Fowler Packing Company, Inc. et al.* (case number: 1:15-CV-00420-DAD-SAB).
[4] This is the only wage and hour survey I have conducted where a "gold standard" validation process could be conducted. Gold standard validation refers to comparing survey responses with relevant data.

3

5.  Section III of this report shows the documents that I reviewed in preparing this report and the analysis of the documents.  Section VI provides a detailed plan for surveying the class members. The development of the survey questionnaire, the method of gathering the data, and the analysis of the survey data is described in detail.  This methodological description will show how the survey will effectively manage the issues in question regarding this matter.  Section IV also shows how the survey results can be tested for potential response bias.  Section V shows how the survey questions can be utilized to extrapolate class-wide damages.  Section V also shows the data that will be collected to assess the potential for nonresponse bias.

## II.  Professional Qualifications

6.  My resume, fee schedule and list of trials and depositions in the last four years are attached as Exhibit A.  I received a Ph.D. in economics from the University of Utah.  My primary fields of expertise are labor economics, statistics, survey methodology and forensic economics.  My publications in the fields of labor economics, forensic economics, survey science and statistics have been cited 169 times, according to Google Scholar.  I have publications in the following peer-reviewed journals: Journal of Legal Economics, Industrial Relations, Journal of Policy Analysis and Management, and the American Journal of Industrial Medicine.  In addition, I am the co-author of a peer-reviewed book published by the W.E. Upjohn Institute for Employment Research.[5]

7.  I am an adjunct associate professor of economics at St. Mary's College in Moraga, California, where I have taught graduate and undergraduate economics courses for thirteen years.  I am the

---

[5] Levine, David I., Frank W. Neuhauser, Richard Reuben, Jeffrey S. Petersen, and Christian Echeverria, *Carve-outs" in Workers' Compensation: An Analysis of the Experience in the California Construction Industry,* W.E. Upjohn Institute for Employment Research, Kalamazoo, MI 2003.

Vice President of the American Academy of Economic and Financial Experts (AAEFE). AAEFE was founded in 1988 and is devoted to the advancement of research and methodology in forensic economics.

8.  I have substantial expertise in projecting class-wide damages based on conducting surveys and utilizing inferential statistical analysis, i.e., using the data sample of survey responses to project to a larger population.  My experience is in the form of academic qualifications and litigation consulting experience.

9.  I am the lead author of peer-reviewed journal articles regarding survey methodology and statistical analysis in class action wage and hour cases.  The title of the articles and the citations are below:

- "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019.

- "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Respondents," *Journal of Legal Economics*, Volume 22, No. 1, October 2015.

The article on survey methodology describes the unique aspects of conducting surveys in wage and hour class actions, as well as remedies for potential bias among the survey respondents.  The article on margin of error describes how to project class-wide damages from survey data and protect defendants from overpaying.

10.  I have conducted surveys in 26 class actions, or PAGA cases, and 24 of those surveys were in wage and hour cases.  In the class action wage and hour class case *Kristal Nucci et al. v. Rite Aid Corporation*, the Honorable Judge Lucy H. Koh cited the results of a survey I conducted several times in her order for class certification.[6]  Judge Koh writes, "Dr. Petersen's expert report

---

[6] *Kristal Nucci, et al. v. Rite Aid Corporation, et al*.  Case number 19-CV-01434-LHK.  Order Denying Motion to Strike and Granting Class Certification.

and underlying survey demonstrate that whether a common policy was communicated across all class members is capable of class-wide resolution.  Importantly, these common questions are not merely peripheral, but rather, go directly to liability on a class-wide basis."[7]  In another wage and hour case where I conducted a survey, *Li et al. v. A Perfect Day Franchise Inc.*,[8] Judge Koh presided and accepted the survey results as the basis for awarding damages.[9]  In the federal case titled *Coleman v Brown*, I was designated as the survey expert in a Special Master research team appointed by the Honorable Kimberly Mueller.[10]  My role was to supervise the design and implementation of a survey to psychiatrists employed by the California Department of Corrections.

11.  I was trained in survey protocol, survey design, and survey question writing during my employment with the United States Government Accountability Office (GAO) as a Senior Economist.  The GAO is the non-partisan research entity for members of Congress.  I have also conducted a survey outside of litigation during my tenure as a postdoctoral fellow at the University of California, Berkeley.  I designed the survey and oversaw the administration to the survey participants who were trauma victims treated at San Francisco General Hospital.  The results of the survey were presented at the American Association for the Surgery of Trauma annual meeting and published in the conference proceedings.[11]

---

[7]Ibid, p.26.

[8] Case number 5:10-CV-01189-LHK.

[9] Judge Koh writes in the decision, "Plaintiffs engaged the firm of Allman & Petersen Economics, LLC to conduct a survey of the class and prepare an expert report as to the monetary compensation due to the class. That survey and report are described in detail in the Declaration of Jeffrey S. Petersen. *See* Petersen Decl. ¶¶ 3-26 & Ex. C. Plaintiffs' experts, relying on data collected from surveyed class members, and using generally acceptable statistical methods, calculated the average payments due to the class for each of the class claims as well as PAGA penalties. Petersen Decl. ¶¶ 17-20 & Ex. C ¶¶ 10, 14, 17A, 17B. The Court is satisfied that Plaintiffs have met their burden of establishing an approximate award based on reasonable inferences provided by a representative sample of the class."

[10] *Ralph Coleman, et al. v. Edmund Brown, Jr., et al.*  Case number 2:90-cv-0520 KJM KJN P.

[11] Petersen, Jeffrey S., L. Papadakis, D. Morabito, A. Boccellari, R.C. Mackersie "Return Economic Productivity Following Acute Traumatic Injury: The Influence of Financial, Physical, and Psychosocial Factors," *Proceedings of the American Association for the Surgery of Trauma Fifty-Ninth Annual Meeting,*1999, p.223.

12.  I have presented at nine professional conferences of survey experts, statisticians and damages experts regarding conducting surveys in class action wage and hour cases and projecting damages from the survey responses.  Recently, I was the chair of a conference session on using the "Reference Manual on Scientific Evidence" as an expert witness.  I have also presented at CLE seminars for attorneys on surveying in wage and hour class actions in light of the U.S. Supreme Court Decision in *Tyson Foods v. Bouaphakeo*.  The titles of the presentations and the conferences are listed below:

- "The Reference Guide on Survey Research," Western Economic Association Annual Conference, San Diego, CA July 2023.

- "Gold Standard Validation of Survey Responses in a Wage and Hour Class Action: The Case of Aldapa vs. Fowler Packing," Fall Forensic Economics Workshop, South Lake Tahoe, CA, October 2022.

- "Supreme Court Decisions in Class Action Wage and Hour Cases," Western Economic Association Annual Conference, June 2022.

- "Wage and Hour Surveys: Assisting With the Liability Determination and Assessing Nonresponse Bias," 32nd Annual Conference of the American Academy of Economic and Financial Experts, April 2021.

- "Statistical Evidence in Wage and Hour Class Actions Since Tyson Foods: Impact on Certification and Trial," Webinar hosted by Strafford Publications, June 2020 and June 2023.

- "The Implications of Recent Legal Decisions for Survey Methodology in Class Action Wage and Hour Cases," Annual Conference of the Pacific Chapter of the American Association for Public Opinion Research, San Francisco, CA, December 2019.

- "Duran Duran: The Important Issues in the Two Duran Decisions for Surveys and Statistical Analysis," Western Economic Association Annual Conference, San Francisco, CA, June 2019.

- "The Margin of Error on Damages Calculations in Class Action Wage and Hour Cases," Allied Social Science Associations Annual Conference, National Association of Forensic Economics, Atlanta, GA, January 2019.

- "Survey Design and Analysis in Class Action Wage and Hour Cases," Annual Conference of the Pacific Chapter of the American Association for Public Opinion Research, San Francisco, CA, December 2018.

- "Using Surveys to Assess Damages in Class Action Wage and Hour Cases," 30th Annual Conference of the American Academy of Economic and Financial Experts, Las Vegas, NV, April 2018.

13.  I have published two peer-reviewed journal articles that utilize inferential statistical analysis from survey data.[12,13]  According to Google Scholar, one of the articles has been cited 98 times.

14.  I have worked on 144 class action cases as a survey expert, statistical expert, or damages expert.[14]  The breakdown between plaintiff and defense retentions in these cases is 89 percent for plaintiffs and 11 percent for defendants.  I have testified at trial for both plaintiffs and defendants in class action cases.  I have testified at trial four times in class action wage and hour cases where I conducted a survey on behalf of plaintiffs.  I have also testified at trial on behalf of defendants where I analyzed the survey conducted by plaintiffs' expert.

15.  I have worked on over 50 individual wage and hour cases where I conducted a telephone interview with the plaintiffs in the cases.  I asked the plaintiffs to provide estimates of hours worked, off-the-clock work time, frequency of meal and rest periods, and/or unreimbursed job-related expenses.  The estimates provided by the plaintiffs were subsequently used to project the amount of unpaid wages they may be due.  These interviews have provided me with a unique perspective on how to structure a survey in a wage and hour class action.  This one-on-one interaction allowed me to assess what individuals can recall and estimate; and what potential

---

[12] Petersen, Jeffrey S. and Craig Zwerling, "Comparison of Health Outcomes Among Older Construction and Blue-Collar Employees in the United States," *American Journal of Industrial Medicine*, Volume 34, Number 3, 1998.
[13] Petersen, Jeffrey S. and Phillip Allman, "The Effect of the Intent to Retire at Age 70 or Older on Work Life Expectancy," *Journal of Legal Economics*, Volume 23, No. 2, April 2017.
[14] One hundred seventeen of these cases were wage and hour.  In addition to these matters, I have worked on over 3,000 legal cases involving income loss for individual plaintiffs.  Retentions on these matters are approximately two-thirds plaintiff and one-third defendant.

biases may be in the estimates.  I have two important conclusions from this experience.  First, unpaid off-the-clock work time, interrupted meal and rest periods, not receiving meal and rest periods, and incurring unreimbursed work-related expenses are distinctive in individuals' memories.  Second, informing the plaintiffs that they may be questioned by the defense about their answers significantly reduces the likelihood of biased responses.

### III.  Plaintiffs' Unpaid Wage Claims and Documents Reviewed

16.  The document titled "Second Amended Class and Collective Action Complaint" in this matter states that Defendants failed to pay all legally required wages due to off-the-clock work. The off-the-clock work is the result of on-call and interrupted meal periods.

17.  I have reviewed the interrogatory responses for 29 putative class members.  These interrogatory responses address issues that will be the subject of the survey.  Specifically, interrogatory response #6 address issues that are closely related to the subject of the survey. For example, Winnesha Harrison's interrogatory response #6 states that she was interrupted by work requirements during her meal breaks and that she was on-call during meal breaks.[15]  She estimates that 90 percent of her meal breaks were interrupted by work requirements.  Ms. Harrison further states that being on-call during meal breaks was "almost universal."

18.  The interrogatory responses of 29 putatitve class members are illustrative of their ability to answer survey questions regarding off-the-clock work time during meal breaks during their employment with Defendants.  Based on my understanding of the facts in this matter, and my considerable experience in wage and hour surveys, the other putative class members that are

---

[15] Plaintiff Winesha Harrison's responses to defendants' first set of interrogatories, requests for production, and requests for adminissions.

contacted to take a survey in this matter will also be able to answer questions regarding off-the-clock work time during meal breaks.

## IV.  Methodology for the Sample Survey

19.  The survey will ask questions about off-the-clock work issues listed in the Complaint for this matter.  The survey respondents will be non-exempt current and former patient care employees employed by Defendants during the class period as described in the Complaint.  The issues that will be addressed in the survey are:

- the frequency that class members performed off-the-clock/unpaid work during their meal breaks due to being on-call or subject to interruption,

- the frequency and duration that class members performed off-the-clock/unpaid work due to meal breaks being interrupted by work requirements.

### *Sample Surveys in Litigation*

20.  Sample surveying is an accepted method in legal proceedings as stated in the Federal Judicial Center's *Reference Manual on Scientific Evidence* (hereafter "*Reference Manual on Scientific Evidence*"):

> *Sample surveys* are used to describe or enumerate the beliefs, attitudes, or behaviors of persons or other social units.  Surveys typically are offered in legal proceedings to establish or refute claims about the characteristics of those individuals … As a method of data collection, surveys have several crucial potential advantages over less systematic approaches.  When properly *designed, executed, and described*, surveys (1) economically present the characteristics of a large group of respondents or other units and (2) permit an

10

assessment of the extent to which the measured respondents or other units are likely to adequately represent a relevant group of individuals or other units.[16]

21. The *Reference Manual on Scientific Evidence* states that surveys are an efficient way to inform the trier-of-fact. Also, the failure to conduct a survey suggests that survey responses would have been unfavorable to the plaintiff:

Although surveys are not the only means of demonstrating particular facts, presenting the results of a well-done survey through the testimony of an expert is an efficient way to inform the trier-of-fact about a large and representative group of potential witnesses. In some cases, courts have described surveys as the most direct form of evidence that can be offered.[17] Indeed, several courts have drawn negative inferences from the absence of a survey, taking the position that failure to undertake a survey may strongly suggest that a properly done survey would not support the plaintiff's position.[18,19]

22. The *Reference Manual on Scientific Evidence* also states that attorneys may participate in drafting the survey questions:

An early handbook for judges recommended that survey interviews be "conducted independently of the attorneys in the case." Some courts interpreted this to mean that any evidence of attorney participation is objectionable. A better interpretation is that the attorney should have no part in carrying out the survey. However, some attorney

---

[16] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.361-362.

[17] Footnote #60 from Reference Manual -- *See, e.g.*, Morrison Entm't Group v. Nintendo of Am., 56 Fed. App'x. 782, 785 (9th Cir. Cal. 2003).

[18] The cases cited that support this issue are found in footnote #61 in the Reference Manual -- Ortho Pharm. Corp. v. Cosprophar, Inc., 32 F.3d 690, 695 (2d Cir. 1994); Henri's Food Prods. Co. v. Kraft, Inc., 717 F.2d 352, 357 (7th Cir. 1983); Medici Classics Productions LLC v. Medici Group LLC, 590 F. Supp. 2d 548, 556 (S.D.N.Y. 2008); Citigroup v. City Holding Co., 2003 U.S. Dist. LEXIS 1845 (S.D.N.Y. Feb. 10, 2003); Chum Ltd. v. Lisowski, 198 F. Supp. 2d 530 (S.D.N.Y. 2002).

[19] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.372.

11

involvement in the survey design is necessary to ensure that relevant questions are

directed to a relevant population.[20]

I typically collaborate with attorneys on the survey questions for the reason noted above – "to

ensure relevant questions are directed to the relevant population."  The *Reference Manual on*

*Scientific Evidence* further states that whether or not attorneys are involved in drafting the

questions is largely irrelevant, since the "key issues for the trier-of-fact concerning the design of

the survey are the objectivity and relevance of the questions on the survey and the

appropriateness of the definition of the population used to guide sample selection.  These aspects

of the survey are visible to the trier-of-fact and can be judged on their quality, irrespective of

who suggested them."[21]

23.  A decision in the *Johnson v. Big Lots Stores Inc.*,[22] which was venued in the Eastern District

of Louisiana, highlighted the importance of the *Reference Manual on Scientific Evidence* for

survey methodology.  The decision states:

> In determining whether a survey was conducted in accordance with 'accepted survey
>
> principles,' most courts look to the Federal Judicial Center's *Reference Manual on*
>
> *Scientific Evidence,* which identifies several reliability factors, including: (1) the survey's
>
> purposes and design: Was it designed to address relevant questions?; (2) population
>
> definition and sampling: Was an appropriate population identified?; and (3) the survey
>
> questions and structure: Were the questions framed to be clear, precise, and unbiased?
>
> Were filter questions provided to reduce guessing? What limitations are associated with
>
> the mode of questioning?

---

[20] Ibid, p.374.
[21] Ibid, p. 374.
[22] *Johnson v. Big Lots Stores Inc.*, United States District Court for the Eastern District of Louisiana
April 29, 2008, Case no: 04-3201.

All of the survey methodology issues noted above are addressed in the forthcoming sections of this report. The forthcoming discussion on the *Duran* decision also notes the importance of these issues.

***The Duran Decision and the Sample Survey of the Class Members in this Case***

24. The California Supreme Court's decision in *Duran v. U.S. Bank Nat. Assn.*[23] (hereafter *Duran I*) addresses the use of statistical sampling as a basis for proving liability and damages in wage and hour cases. The *Duran I* decision recognized that statistical sampling (including surveying) may be an appropriate means of proving liability and damages in wage and hour class actions, as well as managing individual issues that could arise, provided that the statistical sampling be developed with expert input and allows the defendant an opportunity to contest the model. The Court identified several flaws in the methodology of the *Duran I* sampling plan that should be avoided when using surveys and statistical sampling. The three key flaws are: (1) the size of the sample was too small (22 individuals), (2) the sample was not random and resulted in selection bias, and (3) the margin of error was too high due to a sample size that was too small. The margin of error that the Court identified as too high was 43.3 percent.

25. The appellate level decision in the *Duran* case (filed January 17, 2018) (hereafter *Duran II*) noted two important flaws regarding survey data that was gathered by plaintiff's survey expert.[24] First, there were substantial differences in responses regarding hours worked between surveys conducted in 2008 and 2015. Second, the margin of error was calculated based on total hours worked instead of overtime hours.

---

[23] *Duran v. U.S. Bank Nat. Assn.* (2014) 59 Cal.4th 1.
[24] *Duran v. U.S. Bank National Association*, Court of Appeal State of California, First Appellate District, Division One, Filed January 17, 2018.

26.  The sample survey in this matter will not have the flaws identified in *Duran I*.  The sample size will be a large sample that is representative of the population of class members.  The sample will be representative of the population because it will be drawn from a process in which every class member that worked twenty shifts or more for Defendants will have an equal likelihood of being selected for the survey.

27.  The sample survey in this matter will not have the flaws identified in *Duran II*.  First, the reason for the variance in the survey responses in *Duran II* was that the survey respondents were asked different questions about work hours in 2008 and 2015.  Therefore, although it appeared there was recall bias, there was no way to assess if there was bias because of the structure of the questions.  The margin of error on the Duran II survey was 41.0 percent.  As noted above, the margin of error for this survey will be ten percent or less.

### *The Legal Foundation for Surveys in Class Action Wage and Hour Cases*

28.  The Supreme Court of the United States ruling in *Anderson v. Mt. Clemens Pottery Co.* (United States Supreme Court 1946) shows that estimates of unpaid time can be the basis for projecting damages.  In the context of a survey, this legal decision shows that the focus of the trier-of-fact when evaluating the survey responses should be on the reasonableness of the estimates provided by the survey participants.  *Mt. Clemens* states employees may provide estimates regarding the issues in question in litigation when there are no employer records available to assess the issues and damages can be projected from these estimates (pp. 687-688):

> The solution [to the lack of employer records] is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work.  Such a result would place a premium on an employer's failure to

keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated, and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed, or with evidence to negative [sic] the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

29.  The trier-of-fact in this matter is in the position of being able to determine if the survey responses can be utilized as a matter of "just and reasonable inference." The role of the survey expert is to devise survey questions that are unbiased and valid in order to provide the Courts with the best possible data on which to make this determination.

30.  In the matter of *Li v. A Perfect Day*, Federal Judge Lucy Koh used the aforementioned legal standard when determining liability and damages from sample survey results. I was plaintiff's survey expert in the *Li* matter. Judge Koh's decision states:

Where an employer fails to maintain accurate payroll records, an employee carries his burden under the FLSA if he shows he performed work for which he was improperly compensated and produces some evidence to show the amount and extent of that work "as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687 (1946), superseded by statute on other ground, Portal-to-Portal Act, 61

15

Stat. 86-87; *see also Brock v. Seto,* 790 F.2d 1446, 1448 (9th Cir. 1986); *McLaughlin v. Seto,* 850 F.2d 586, 589 (9th Cir. 1988). The Ninth Circuit has approved "approximated awards where plaintiffs can establish, to an imperfect degree of certainty, that they `have performed work and have not been paid in accordance with the FLSA.'" *Alvarez v. IBP, Inc.,* 339 F.3d 894, 914-15 (9th Cir. 2003) citing *Brock,* 790 F.2d at 1448 (internal quotation marks and alterations omitted). "In such instances, the only uncertainty is the amount of damage, not the fact that damages are due. Where an approximate award based on reasonable inferences forms a satisfactory surrogate for unquantified and unrecorded actual times, an approximated award is permissible." *Id.* (internal quotation marks, citations, and alterations omitted).

Under this burden shifting approach, both the Ninth Circuit and California courts have permitted district courts to award back wages based upon evidence of damages from a representative sampling of class members. *McLaughlin v. Seto,* 850 F.2d 586, 589 (9th Cir. 1988); *Amaral,* 163 Cal. App. 4th at 1189 ("*Anderson*'s reasoning has also been applied to permit class action plaintiffs to prove their damages for unpaid overtime by the use of statistical sampling."). Thus, where, as here, Plaintiffs have established liability for unpaid wages (see discussion above), and that Defendants have failed to maintain accurate payroll records, the court can rely on evidence of a representative sampling of class members regarding the damages owed to establish liability as to the class.[25]

---

[25] *Li v. A Perfect Day Franchise Inc.*, United States District Court, Northern District of California, Case No. 5:10-CV-01189-LHK.

*The Legal Foundation for Utilizing Averages from Survey Results to Project Class-Wide Damages*

31.  If an average of survey responses is utilized to determine damages, the average will overpay some individuals and underpay other individuals.  An average will always have this result since survey respondents will report values higher and lower than the average.  There is legal precedent that this is acceptable in a class action wage and hour case, and the average of survey responses can be utilized to project class-wide damages.  The legal precedent is the decision about sampling and extrapolation in *Bell v. Farmers Insurance*.[26]  The *Duran I* decision stated that *Bell* is the "premier case approving the use of representative testimony in an overtime class action."[27]  An average will always be "imperfectly tailored to the facts of particular employees," since the average may not be exactly the same as their individual claim for damages.  However, the *Bell Court* clearly stated this "imperfect tailoring" is preferable to every class member proving their individual damages claim so the courts are not "unduly burdened."

The *Bell Court* stated (p.8):

> It was within trial court's discretion, in class action on behalf of approximately 2,400 claims representatives against an insurance company seeking compensation for unpaid overtime, to use statistical methodology of random sampling and extrapolation for the determination of aggregate class-wide damages; trial court was permitted to weigh the disadvantage of statistical inference, the calculation of average damages imperfectly tailored to the facts of particular employees, with the opportunity it afforded to vindicate an important statutory policy without unduly burdening the courts.

---

[26] *Bell v. Farmers Insurance Exchange*. 2004. Cal.App 4th. 715, 9 Cal.Rptr.3d 544.

[27] *Duran et al. v. U.S. National Bank Association*. 2014.  California Supreme Court, 59 Cal.4th 1172, Cal. Rptr. 3d 371, 325 P.3d 916.

In the matter of *Reich v. Gateway Press*, the Third Circuit adopted similar reasoning to *Bell* when describing why a sample of employees can be used for damages:

> Courts commonly allow representative employees to prove violations with respect to all employees … Thus, not all employees need to testify in order to prove the violations or to recoup back wages.  Rather, the Secretary can rely on testimony and evidence from representative employees to meet the initial burden of proof requirement ... 'Once the pattern is established, the burden shifts to the employer to rebut the existence of the violations or to prove that individual employees are excepted from the pattern or practice.'[28]

32.    The citations and analysis of the *Bell* and *Duran* decisions are not meant to be definitive of the legal standards in the jurisdiction for this matter.  The citations and analysis of the *Bell* and *Duran* decisions are included in this report since they pertain to the survey and statistical issues that are directly related to issues being described for this matter.

***Sampling Plan for Survey and Statistical Analysis***

33.  Figure 1 shows the methodology for the design and process of the survey that will be conducted in this matter.  This is a well-established methodology as described in *Survey Methodology* by Robert M. Groves.[29]  Dr. Groves is a preeminent survey scientist and he was formerly the Director of the U.S. Bureau of the Census.  Each step of the survey design and process is described below.  This process results in a representative data set that is statistically reliable and valid.

---

[28] *Reich v. Gateway Press*, 13 F.3d 685 (3d Cir. 1994).
[29] Groves, R. M., Fowler, F.J., Couper, M.P., Leprowski, J.M, Singer, E., Tourangeau, R., *Survey Methodology*, John Wiley & Sons, New Jersey, 2009.

**FIGURE 1: SURVEY DESIGN AND PROCESS**[30]



---

[30] Source : Groves, Robert M. et al. 2009. *Survey Methodology*, New Jersey: John Wiley and Sons, Inc., page 47.

*Research Objectives*

34.  The research objectives of the survey are as follows:

- determine the frequency that class members performed off-the-clock/unpaid work during their meal breaks due to being on-call and subject to interruption,

- determine the frequency and duration that class members performed off-the-clock/unpaid work due to meal breaks being interrupted by work requirements.


*Mode of Data Collection*

35.  The survey will be administered telephonically by Davis Research or a similarly qualified survey research firm.  According to peer-reviewed science on wage and hour surveys, telephone surveys tend to be the preferable method for obtaining survey responses.[31]  I have previously collaborated with Davis Research on sixteen surveys in wage and hour cases.  Four of these surveys involved off-the-clock work time and the estimates of unpaid time were valid and reliable for projecting class-wide damages.  Seven of the surveys involved on-call and/or interrupted break periods.  The survey responses were valid and reliable for projecting class-wide damages.  These surveys were conducted telephonically which was an efficient and effective mode for obtaining the survey responses.  The telephonic method has also proven to be efficient and effective in other wage and hour surveys I have conducted.

36.  In this matter, a mail survey will be problematic as class members who are no longer employed by Defendants may have changed addresses.  As a result, verifying whether they received the survey is a very difficult endeavor.  An internet-based survey will likely have similar difficulties due to the problem of determining if respondents received the e-mail which

---

[31] Petersen, Jeffrey S., Phillip Allman, and William Lee, "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Survey Respondents," *Journal of Legal Economics*, Volume 22, Number 1, October 2015.

requested that they participate in the survey.  A telephone survey is preferable in this matter because it allows for control over the contact with the survey participants, with as many follow up calls as needed to attain an acceptable cooperation rate.  A telephone survey also provides the data for an accurate computation of the response rate.

*Sampling Frame*

37.  Sampling frames are lists or procedures intended to identify all elements of a target population.  The target population in this matter will be class members that worked twenty shifts or more for Defendant at Riverplace Behavioral Health.  According to *Survey Research Methods* by Floyd Fowler, "Any sample selection procedure will give some individuals a chance to be included in the sample while excluding others.  Those people who have a chance of being included among those selected constitute the sample frame."[32]  The sample frame is evaluated based on: (1) how comprehensively it covers the target population, (2) whether the probability of being selected can be computed, and (3) how efficiently the members of the sample frame can be contacted.[33]  Therefore, the sampling frame goes hand-in-hand with determining the method of data collection.

38.  The class members are the individuals who possess the knowledge to answer questions related to off-the-clock work.  Therefore, they are the target population and can be comprehensively covered through a simple random sample.  Every class member who works twenty or more shifts during the class period will have an equal probability of being selected to participate in the survey.  I have used the twenty shift criteria in other wage and hour surveys and there has been no bias due to employment tenure in the survey responses.  The criterion of

---

[32] Fowler, Floyd. 2014. *Survey Research Methods*, *Fifth Edition,* Sage Publications Inc., page 15.
[33] Fowler, Floyd. 2014. *Survey Research Methods*, *Fifth Edition,* Sage Publications Inc., page 16.

working twenty or more shifts ensures that survey respondents have sufficient experience with Defendant's employment policies.  There will not be response bias due to the twenty-shift criteria.  Individuals do not have differential work experiences based on working more or less than twenty shifts in terms of experiencing Defendant's employment policies.  The only difference between these groups is that individuals who worked more than twenty shifts are more likely to provide valid and reliable survey responses because they have sufficiently experienced the policies that are the subject of the survey.

39.  I have used the twenty-shift criteria for inclusion in the sample frame in nineteen wage and hour surveys.  The first time I used the twenty-shift criteria was based on a hypothesis that this number of shifts would be sufficient exposure to the work environment to be able to answer survey questions regarding wage and hour issues.  At the culmination of the survey, I included the number of work shifts in the response bias regression equation and did not find that the number of shifts had a statistically significant effect on the survey responses.  Therefore, whether individuals worked 21 shifts or 1,000 shifts, they were not providing differential responses based on their tenure at the employer.[34]  For example, surveys on the frequencies of authorized and permitted rest breaks showed no difference due to work tenure.  In other words, the length of employment had no effect on how many missed rest breaks the survey respondents were reporting.  Since the twenty-shift criteria has not resulted in response bias in eighteen prior surveys, as shown by the regression analysis, I continue to use it as a criteria for inclusion in the sample frame.

---

[34] The exception to this statement is that differential experiences were reported based on tenure when it made sense. For example, in a survey I conducted of Rite Aid employees regarding the amount of purchases to conform to the dress code, employees who work more shifts reported more purchases.

22

40.  The only individuals within the sample frame that cannot be contacted for the survey are those whose listed phone numbers are no longer in service, and their current phone number cannot be obtained.  According to peer-reviewed research on wage and hour surveys, this is not a potential source of bias, since there is no reason an individual without a working telephone number should be any different than any of the other class members.[35]  There is no logical reason that individuals who changed their phone number after departing employment from Defendant would have different employment experiences than individuals who did not change their phone numbers.  Employees are not assigned to different jobs based on whether they changed phone numbers.  Employees are not subjected to different meal period policies based on whether they changed phone numbers.  Therefore, changing phone numbers has no correlation with having differential work experiences in this matter.  The sample frame for individuals on the class member list with working telephone numbers is valid based on the three criteria noted above.  The target population will be comprehensively covered, the probability of being selected can be calculated, and the sample members can be efficiently contacted.

### Construct and Pretest Survey Instrument

41.  The survey instrument is the questionnaire that is administered to the survey participants.  The survey methodology textbook *Designing and Conducting Survey Research* states that the introduction of the survey instrument should build trust in the survey participants so they will be willing to be forthcoming with information:

---

[35] Petersen, Jeffrey S., Phillip Allman, and William Lee, "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Survey Respondents," *Journal of Legal Economics*, Volume 22, Number 1, October 2015, page 28.

> A questionnaire is a conversation, and, like most conversations, it builds on itself, beginning with an introduction.  It is important to inform potential respondents about the purpose of the study in order to convey its importance and alleviate any concerns that potential respondents are likely to have.  From the researcher's point of view, there is a need to convince potential respondents that their participation is useful to both the survey's sponsor or client and the respondents themselves.[36]

42.  The *Reference Manual on Scientific Evidence* advises that the double-blind method be utilized "whenever possible."[37]  Therefore, an analysis of whether it is possible to use the double-blind method is warranted.  A double-blind survey would require that the survey respondents be unaware of the survey sponsor and the purpose of the survey.  In other words, the survey respondents are "blind" about the purpose of the survey.  There are many reasons why this method should not be used in a wage and hour class action survey.  The issue of trust between the survey respondent and survey interviewer has become more important over the last decade due to the increase in identity theft and the perception among the general public that identity theft should be a genuine concern.  Therefore, potential survey respondents are not likely to participate in a survey unless they know why the survey is being conducted, and how their responses are going to be used.  This is especially the case for individuals who would fear losing their jobs as a result of participating in a survey.  These individuals need to be reassured that retaliation for participating in a survey is not permitted under the law and legal action will be taken if they are retaliated against.

---

[36] Rea, Louis M. and Richard A. Parker, *Designing and Conducting Survey Research: A Comprehensive Guide, Fourth Edition*, Josey-Bass, 2014, page 39.

[37] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.410-411.

43.  When a survey respondent is first contacted on the phone, it is imperative to gain their trust, as noted above.  If a survey is conducted using the double-blind method, the survey interviewer cannot inform the survey respondent why they are calling.  The dialogue would be as follows if a double-blind survey were utilized in this matter:

- (Survey Interviewer) – I am calling to conduct a survey regarding your work experiences with Acadia Healthcare.

- (Survey Respondent) – Why do you want this information?  How is it going to be used?  Who are you calling on behalf of?  What is this all about?

- (Survey Interviewer) – Sorry, I cannot answer any of those questions, all I can do is ask you the survey questions.

When the survey respondent does not have these important questions answered, they are likely to terminate the call and not participate in the survey.   As noted above, the survey methodology textbook *Designing and Conducting Survey Research* states that during the initial phase of the survey, "it is important to inform potential respondents about the purpose of the study in order to convey its importance and alleviate any concerns that potential respondents are likely to have."[38] This is why a double-blind survey will not be used in this matter.

44.  The advisable method for conducting the survey in this matter is to make the survey interviewer and the respondents "as blind as possible."  Therefore, the scripted survey introduction will only reveal that the survey is regarding employment issues at Acadia Healthcare as part of a litigation matter and the survey participants need to be accountable to defendants regarding their responses.  No other information about the litigation will be divulged unless the survey participant expresses concern about participating in the survey and potentially

---

[38] Rea, Louis M. and Richard A. Parker, *Designing and Conducting Survey Research: A Comprehensive Guide, Fourth Edition*, Josey-Bass, 2014, page 39.

25

having to be questioned by the defense.  If this occurs, then a script will be read that informs the survey participant that no legal action could be taken against them for participating in the survey.

45.  The recent California Court of Appeals decision in *McCleery v. Allstate Insurance*[39] also shows why double-blind surveys should not be used in wage and hour class actions.  A double-blind anonymous survey was conducted in that matter as the basis for projecting class-wide damages.[40]  The Court's decision in that matter did not allow the survey results to be used to project class-wide damages.  The decision highlights the importance of transparency in conducting surveys in litigation, so that the defense can defend itself against claims made against them.[41]    Transparency is also necessary to induce accountability among the survey respondents. Double-blind surveys do not have transparency and do not impose accountability.  According to peer-reviewed research on class action wage and hour surveys, transparency and accountability are essential parts of survey methodology in wage and hour class actions.[42]

46.  Finally, there is an ethical reason to disclose to the survey participants that the survey is part of litigation.  If a double-blind survey is conducted, survey participants do not know they are participating in litigation.  If the trier-of-fact subsequently requires the survey participants names to be disclosed, which occurred in *Duran*, individuals who were promised anonymity are no longer anonymous.  Their survey responses will be shown to their current or former employer. Individuals should be informed about this possibility, and a double-blind survey does not allow this information to be conveyed.

---

[39] Court of Appeal of the State of California, Second Appellate District, Division One, Filed 7/1/19.  Los Angeles Superior Court Case BC410865.

[40] Ibid., see page 2.

[41] Ibid., see page 25.

[42] Petersen, Jeffrey S., Phillip Allman, and William Lee, "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Survey Respondents," *Journal of Legal Economics*, Volume 22, Number 1, October 2015, page 32.

47.  The mental process of answering questions from a survey instrument is generally found in four groups of processes: comprehension, retrieval of information, estimation and judgement, and reporting of an answer.[43]  Comprehension includes both the question being asked and the instructions previously given on the survey instrument.  Therefore, both the question and the instructions must be easily comprehended.  Retrieval is the process of recalling information relevant to answering the question.  Estimation and judgement are the processes of combining or supplementing the recall of information.

48.  In this matter, comprehension of the questions is not likely to be an issue.  The topics are very straightforward and familiar to the survey respondents.  The more difficult issue is the retrieval of information interacting with estimation and judgement.  All of the survey participants have the necessary information stored in their memories since they experienced Defendants employment policies.  However, in the process of retrieving this information, their process of estimation and judgement may be influenced by their self interest in anticipation of receiving a payout from the litigation.  Therefore, the Defendant in this matter could potentially overpay due to inflated survey responses.  This situation is known as moral hazard, which is defined as "any situation in which one person makes the decision about how much risk to take while someone else bears the cost if things go badly."[44]  According to peer-reviewed literature on wage and hour surveys, the solution to self-interest bias and moral hazard in a wage and hour survey is to conduct the survey without anonymity and to ensure the survey participants are aware they need to be accountable for the accuracy of their survey responses:

---

[43] Source: Groves, Robert M. et al. 2009. *Survey Methodology*, New Jersey: John Wiley and Sons, Inc., page 220-222.
[44] Krugman, Paul R. 2009. *The Return of Depression Economics and the Crisis of 2008*. New York: W.W. Norton.

Survey researchers should assess potential bias among surveyed class members in class action wage and hour cases through the lens of moral hazard. Moral hazard has been described as 'any situation in which one person makes the decision about how much risk to take while someone else bears the cost if things go badly.' Survey respondents who are anonymous bear no risk associated with inflating their work hours because there is no accountability. Anonymous survey respondents can be very costly to the defense because inflated estimates of work hours lead to higher damages. Survey respondents who are not anonymous bear considerable risk when inflating a work hour estimate. They might look foolish, and possibly be subject to perjury, if they cannot substantiate their estimate of work hours during a deposition and/or trial testimony. Informing survey respondents in a class action wage and hour case at the outset of the survey that they may be questioned by the defense about the accuracy of their answers is a useful tool in limiting moral hazard.[45]

49. To control for the potential of self-interest bias, the following statement will be read to the survey participants during the introduction of the survey:

This survey is part of a litigation matter and therefore I need your answers to be as accurate as possible. Your answers will not be anonymous and you may be questioned by the defendants about your answers.

50. The survey questions will conform to the U.S. Supreme Court ruling in *Tyson Foods, Inc. v. Bouaphakeo*[46] since individual class members would present answers to these questions to establish liability and damages if they filed a lawsuit regarding their individual claim.

---

[45] Petersen, Jeffrey S., Phillip Allman, and William Lee, "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Survey Respondents," *Journal of Legal Economics*, Volume 22, Number 1, October 2015, page 32-33.

[46] 577 U.S. 136 S. Ct. 1036; 194 L. Ed. 2d 124

28

51.  The survey in this matter will ask respondents to provide the following information regarding their employment with Defendant:

- if they are currently or formerly employed by Acadia Healthcare,

- their job title,

- the frequency that they were expected to be available to perform their job duties during attempted meal breaks,

- the frequency that meal breaks were interrupted due to work requirements,

- the average duration of work interruptions during meal breaks.

52.  The survey will also ask the respondents to provide the following information:

- their level of certainty about the responses they provided in the survey,

- level of education,

- age,

- gender,

- whether they knew anything about a lawsuit involving Acadia Healthcare, and if "yes", an open-ended question about what they knew.

The responses to these questions can be utilized to test for bias in the responses as described in the "perform analysis of data" section.

53.  The survey instrument will be piloted on approximately 40 randomly selected class members.  This number of pilot responses is within the prescribed range of the *Reference Manual on Scientific Evidence*.[47]  The pilot is utilized to assess question clarity, question comprehensiveness and question acceptability.[48]  Clarity refers to whether or not the respondents

---

[47] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, page 388.

[48] Rea, Louis M. and Richard A. Parker, *Designing and Conducting Survey Research: A Comprehensive Guide, Fourth Edition*, Josey-Bass, 2014, page 38.

understand the questions.  Comprehensiveness refers to offering survey participants the complete range of alternatives.  Acceptability refers to burdensome questions and/or the invasion of privacy.  The survey questions will be revised following the pilot if clarity, comprehensiveness or acceptability is an issue.

54.  I have asked off-the-clock and break period questions in previous surveys for class action wage and hour cases that are similar to the questions that will be asked in this matter.  Therefore, it is unlikely that any of the above issues will arise during the pilot phase, and thus I see no reason to gather survey responses prior to class certification.  My typical protocol is to advise attorneys to commit resources to gathering survey responses prior to class certification if I have not asked the survey questions in a prior survey and am unsure if survey participants can provide valid and reliable responses to the questions.  In this matter, I can confirm that survey participants in other matters found the questions about off-the-clock work and break periods to be clear and acceptable, and the responses were valid and reliable.

55.  The survey will be available in languages other than English if necessary.  Typically, the need to translate the survey into other languages is assessed during the pilot phase.  I rely on the survey research firm to report to me if a translation is needed.

*Design and Select Sample*

56.  The selection process for the pilot survey participants in this matter will be a simple random sample.  This is a selection process that allows each member of the sample frame to have an equal probability of being selected for the survey.[49]  The expected survey participants are the

---

[49] Source: Groves, Robert M. et al. 2009. *Survey Methodology*, New Jersey: John Wiley and Sons, Inc., page 103.

30

potential class members comprised of current and former employees that worked twenty or more shifts.

57. The sample size is based on a targeted margin of error. In the wage and hour surveys that I have conducted in the past, I have typically targeted the margin of error at five percent for proportional data.[50] Proportional data refers to survey questions that ask about percentages or a "yes or no" response. There is no guidance in statistical science quantifying what constitutes a margin of error that is too high with respect to sample survey data in class action cases. For example, a margin of error that is "too high" is found in a sample mean of survey data of likely voters prior to an election. If there are only two candidates on the ballot and the sample mean shows one candidate will receive 52 percent of the vote and the margin of error is five percent; then the margin of error is obviously "too high." The margin of error shows that an outcome could be that this candidate may only receive 47 percent of the vote. The survey cannot make a prediction about who is likely to win the election. This type of reasoning does not apply to liability or damages in a class action wage and hour case. The margin of error is a statistic in a wage and hour case which assists the trier-of-fact by providing information about the magnitude of potential error in the results. Whether it is "too high" is a subjective assessment to be made by the trier-of-fact when balancing the welfare of plaintiffs and defendants.[51]

68. There is legal precedent that a margin of error of ten percent or less is acceptable in a class action wage and hour case, if damages are to be projected from the average of the survey responses. The legal precedent is the decision about margin of error in *Bell v. Farmers*

---

[50] Rea, Louis M. and Richard A. Parker, *Designing and Conducting Survey Research: A Comprehensive Guide, Fourth Edition*, Josey-Bass, 2014, page 165.

[51] Petersen, Jeffrey S. and Phillip Allman, "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019.

*Insurance*.[52]  The *Duran I* decision stated that *Bell* is the "premier case approving the use of representative testimony in an overtime class action."[53]  While this matter does not involve overtime, it does involve using a representative sample to project damages to the population of class members, which is similar to the statistical analysis in *Bell*.  The peer-reviewed statistical method for projecting damages in a class action wage and hour case when the margin of error is above ten percent is to use the lower bound of the confidence interval.[54]

59.  The pilot study results will be utilized to determine the number of survey responses needed to achieve a five percent margin of error for the proportional data.  The sample size is based upon the size of the class and the type of questions to be asked of the survey participants.  The formula for determining the sample size when proportions are the data being gathered is as follows[55]:

$$n = (Z^2 (p (1-p)) N) / (Z^2 (p (1-p) + (N-1) ME^2)$$

where,

|  |  |  |
|---|---|---|
| n | = | sample size |
| N | = | population size (i.e., the size of the class) |
| Z | = | Z score for the level of confidence |
| p | = | unknown proportion for the sample |
| ME | = | acceptable margin of error for the proportional variable |

---

[52] *Bell v. Farmers Insurance Exchange*. 2004. Cal.App 4th. 715, 9 Cal.Rptr.3d 544.
[53] *Duran et al. v. U.S. National Bank Association*. 2014.  California Supreme Court, 59 Cal.4th 1172, Cal. Rptr. 3d 371, 325 P.3d 916.
[54] Petersen, Jeffrey S. and Phillip Allman, "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019.
[55] Rea, Louis M. and Richard A. Parker, *Designing and Conducting Survey Research: A Comprehensive Guide, Fourth Edition*, Josey-Bass, 2014, page 167.

60.  The proportion that requires the largest sample size is 50 percent.  Therefore, to be as conservative as possible in estimating the sample size, 50 percent is inputted into the above equation for the variable "p" if there is no information available.  The "Z score" is associated with the desired level of confidence.  According to the *Reference Manual on Scientific Evidence*, a 95 percent confidence interval is widely accepted among scientists:

> Traditionally, scientists adopt the 95 percent level of confidence, which means that if 100 samples of the same size were drawn, the confidence interval expected for at least 95 of the samples would be expected to include the true population value.[56]

61.  It is my understanding that the proposed class has approximately 567 putative members. These potential class members are current and former Acadia Healthcare hourly non-exempt patient care employees at Riverplace Behavioral Health.  The approximate number of completed survey responses that can be obtained from this population of class members is 110.  This estimate is based on the typical response and cooperation rates in past wage and hour surveys I have conducted.  The maximum margin of error for this sample size for proportional questions is 8.4 percent.  If there is a high proportion of class members that answer the questions similarly, for example 90 percent of survey respondents state they have off-the-clock work time, then the margin of error falls to 5.0 percent.

62.  Survey questions that ask about continuous non-proportional issues require a different method for assessing the sample size to achieve the targeted margin of error.  An example of a continuous non-proportional issue in this matter is the average number of minutes off-the-clock work due to meal periods being interrupted.  The pilot survey responses are used to project the standard deviation for the survey response.  The projected standard deviation is then utilized to

---

[56] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.381.

determine the sample size based on the targeted margin of error.  Surveys I have conducted in the past that asked about continuous non-proportional issues involved employees of Sephora, Starbucks, Varsity Tutors, Rite Aid, Fowler Packing, Leprino Foods, Bankers Life and Casualty, and Sam's Club.

63.  The first phase of the sampling process will be that I will instruct Davis Research to obtain forty survey responses through a random sampling process where every class member that has worked twenty shifts or more will have an equal probability of being selected for the survey.  A sample size of thirty is considered a "large sample" in statistical analysis and can used to make inferences about a population as long as the sample is not biased.[57]  The second phase of the survey will be to gather as many survey responses as possible from the population.  The survey responses from the random sampling phase will be compared with the population sampling phase to see if there is any potential bias due to the entire survey not being conducted randomly.  I have used this protocol in other wage and hour surveys and the results of the statistical analysis did not show any bias.

### *Recruit and Measure Sample*

64.  This phase of the project refers to implementation of the survey instrument to the survey participants.  To encourage participation, an incentive payment of $10 will be offered for completing the survey.  The American Association of Public Opinion Research (AAPOR) lists incentive payments on their best practices guide:

---

[57] Source: McClave, James and Terry Sincich, *Statistics, 13th Edition*, Pearson: Boston, 2017, p.321.

> Specific procedures designed explicitly to stimulate survey cooperation or participation should be considered, such as … offering monetary (i.e., cash) or non-monetary (some other valued reward) incentives to encourage participation.[58]

65. The reason it is a best practice to give an incentive payment is that survey participants are less likely to rush through a survey when they receive a payment for their time. The survey participants feel their time is being respected and are more likely to give a thoughtful response. There is no bias due to offering an incentive payment to survey participants in a class action wage and hour survey. In fact, the failure to give an incentive payment will result in biased responses because survey participants will be in a hurry to finish the survey.

### Code Data

66. The survey data will be coded by the survey research firm and sent to me in an Excel spreadsheet.

### Perform Analysis of Data

67. A multiple regression technique that is specifically designed for wage and hour class actions will be utilized to assess potential response bias in the survey responses. The regression technique is that the survey response is the dependent variable and the independent variables are the following:

- employment status,
- number of shifts worked,
- age,

---

[58] American Association of Public Opinion Research, "Best Practices for Survey Research," https://www.aapor.org/Standards-Ethics/Best-Practices.aspx.

- level of certainty about response,

- took survey during random sampling phase,

- took survey on first call,

- took survey on second or third phone call,

- knowledge of the lawsuit.

If the coefficients on any of these variables are statistically significant it is a potential indicator of bias. The coefficient can subsequently be used to adjust the survey response such that the bias will be removed.

68. Davis Research will track the number of phone calls placed to the survey participants. The regression equation can be used to test the hypothesis that individuals who may be biased will be "eager" to participate in the survey due to the possibility of financial gain and will take the survey on the second or third call attempt after receiving a voicemail regarding the survey. The responses of these potentially eager respondents can be compared to the responses of the respondents who respond after more call attempts. Another hypothesis is that individuals that take the survey on the first phone call have the least potential for bias since they have not heard anything about the survey prior to beginning the questions. In every survey I have conducted to date, both hypotheses have been rejected – given that there was no statistically significant difference in the survey responses between individuals that took the survey with one or two call attempts compared to those who took the survey after many call attempts.

69. Multiple regression analysis is a widely accepted method for determining the effect of different variables on the variable in question as explained in the *Reference Manual on Scientific Evidence*:

Multiple regression analysis is a statistical tool used to understand the relationship between or among two or more variables. Multiple regression involves a variable to be explained—called the dependent variable—and additional explanatory variables that are thought to produce or be associated with changes in the dependent variable. For example, a multiple regression analysis might estimate the effect of the number of years of work on salary. Salary would be the dependent variable to be explained; the years of experience would be the explanatory variable.[59]

This statistical technique provides results that can be used "in determining whether a particular effect is present and measuring the magnitude of a particular effect."[60]

70. Two variables that can be utilized to establish whether the survey participants are representative of the class members are their job titles and the departments where they worked. If Defendants produce this data for all class members, I can compare the proportion of survey participants job titles and departments with the proportions of the individuals that did not take the survey. If there is a high degree of correlation between these proportions then the survey participants are representative of the class members in terms of their job titles and work locations. In other words, any potential variations in meal period off-the-clock work due to job duties and/or work locations will be accounted for in the survey responses.

## V. How the Survey Data can be Used to Extrapolate to the Class

71. The survey is conducted on a sample of the class members. The data is then used to extrapolate to the remainder of the class (the non-sampled population). If the data is valid and

---

[59] Rubenfeld, Daniel L., "Reference Guide on Multiple Regression," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.305.
[60] Ibid, p.306.

reliable, and the margin of error is within acceptable limits, then the extrapolation will result in a measure of class-wide damages that is scientifically valid.  Also, the frequencies of the survey responses can be utilized by the trier-of-fact in determining liability.

72.  The questioning sequence in the survey instrument will generate a point estimate for a variable of interest in this matter – for example, the frequency and duration of off-the-clock work due to interrupted meal periods.  Aggregating the survey responses for this question results in an average percentage of shifts during which off-the-clock work was performed and the average duration of the work.  The frequency and duration of minutes can be utilized for determining damages.  For example, if the average response is 95 percent of shifts and the average duration is 10 minutes, then the projected off-the clock work time is 9.5 minutes (95 percent of shifts x 10 minutes).  This figure can be mapped onto the payroll data to determine unpaid wages.

73.  An average of a survey response can be a fair and balanced statistic for projecting class-wide damages.  It is a "fair and balanced" statistic because there is an equal probability that damages computed from an average will be too high or too low.  Therefore, the probability of overpayment or underpayment is equally shared by plaintiffs and defendants in the litigation.

74. An alternative to projecting damages from the survey average is to use the boundaries of the 95 percent confidence interval.  According to peer-reviewed research, using the lower bound of the confidence interval to project damages results in a 97.5 percent probability that defendants are not overpaying for damages.[61]  For example, if the average is 9.5 minutes of off-the-clock unpaid work time, and the margin of error is ten percent, the lower and upper bounds of the 95 percent confidence interval are 8.55 minutes to 10.45 minutes.  If the trier-of-fact determines that

---

[61] Petersen, Jeffrey S. and Phillip Allman, "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019, p.149.

38

the survey results are valid and reliable, then there is a 97.5 percent probability that defendants will not overpay for class-wide damages if 8.55 minutes is used as the basis for projecting unpaid off-the-clock work time.

75. The survey results and statistical analysis will be provided to the damages expert in this matter to calculate class-wide damages.

*Assessing Bias in the Survey Average due to Nonresponse*

76. A typical criticism in defense expert reports in class action wage and hour cases where I have been plaintiff's expert and conducted a survey, is that they claim the responses are biased due to nonresponse. This means that the individuals who took the survey are not representative of the individuals who did not take the survey. However, I have never seen a compelling analysis from these defense experts that shows nonresponse bias is present in the results. Their arguments usually boil down to the speculative assumption that individuals who have something to gain from taking the survey are more likely to be willing to participate in the survey. These defense experts have never provided any data that shows that this actually occurred. Moreover, the counterfactual may be more compelling – individuals who want to present favorable information about defendants may be more willing to participate in the survey.

77. As noted above, Davis Research will track the number of calls placed to the survey respondents. Typically, they make at least eight calls to the individuals that have been selected for potential participation in the survey. The number of call attempts to obtain survey responses can be used to assess the differences in responses for individuals who were difficult to get on the phone to take the survey versus those who responded relatively quickly. The individuals who are difficult to contact are more likely to be representative of the individuals who did not take the

survey.[62]  A correlation analysis can be performed to assess for potential differences in number of calls influencing the survey response.  If there is no correlation between the call attempts and the survey responses, it is another indicator that nonresponse bias is not occurring.  A similar non-response bias analysis was approved of in the *Johnson v. Big Lots* decision.

78.  I will also instruct Davis Research to track the individuals who refuse to participate in the survey.  Davis Research will track the point of refusal in the survey instrument and ask for a detailed reason why the individual is refusing to participate in the survey.  This method of tracking allows for a statistical analysis of differences in the point of refusal as well as an analysis of the reasons for refusing.

79.  The other common criticism among defense experts is that the response rate is too low.  The response rate is the number of survey participants divided by the number of individuals attempted to contact to take the survey.  However, I have never seen a compelling analysis that shows the response rate is an indicator of nonresponse bias.  The now superseded second edition of the *Reference Manual on Scientific Evidence* (published in 2000) stated that certain response rates needed to be achieved to obtain an unbiased data set.  However, during the last two decades, a substantial amount of research has been conducted on response rates, with none finding that a specific rate is an indicator of bias.  The third edition of the *Reference Manual on Scientific Evidence* (published in 2011) contains none of the language about specific response rates that was present in the second edition.  The third edition states that "reasonable estimates" can be obtained even if there is a relatively low response rate:

> Contrary to earlier assumptions, surprisingly comparable results have been obtained in
> many surveys with varying response rates, suggesting that surveys may achieve

---

[62] Freedman, David, Robert Pisani, and Roger Purves, *Statistics, 4th Edition*, New York: W.W. Norton & Company, 2007, page 344.

reasonable estimates even with relatively low response rates. The key is whether nonresponse is associated with systematic differences in response that cannot be adequately modeled or assessed.[63]

80.  Moreover, one of the preeminent scholars on survey research is Robert Groves[64], and his research clearly shows that response rates do not tell a clear picture of potential bias.  Public Opinion Quarterly, the peer-reviewed journal of the American Association for Public Opinion Research, devoted an entire issue to the subject of non-response bias.  Dr. Groves wrote the lead article titled "Nonresponse Rates and Nonresponse Bias in Household Surveys." In this article, Dr. Groves addresses the issue of whether there is a singular level for a response rate that shows response bias is present.  He concludes definitively that there is not:

> Many surveys of the U.S. household population are experiencing high refusal rates. Nonresponse, can, but need not, induce nonresponse bias in survey estimates.  Recent empirical findings illustrate cases when the linkage between nonresponse rates and nonresponse biases is absent.[65]

Groves further states,

> Assembly of methodological studies whose designs permit estimation of nonresponse bias shows that empirically there is no simple relationship between nonresponse rates and nonresponse biases. That is, research results comport with the assertion that covariances between survey variables and response propensities are highly variable across items within a survey, survey conditions, and populations. Hence, there is little empirical

---

[63] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.385.

[64] Dr. Groves was the head of the United States Bureau of the Census from 2009 to 2012 and is currently a professor in the math and statistics department at Georgetown University.

[65] Groves, Robert M., "Nonresponse Rates and Nonresponse Bias in Household Surveys," *Public Opinion Quarterly*, Volume 70, No. 5, Special Issue 2006, page 646.

support for the notion that low response rate surveys de facto produce estimates with high nonresponse bias.[66]

81. Based upon my considerable experience in conducting surveys in wage and hour class actions, and interviewing more than 50 individuals with wage and hour claims, the most likely reason that people don't participate in wage and hour surveys is due to fear of litigation. They do not want to be called to deposition or trial because it is an unknown process of which they are fearful. This provides no indication as to how they may respond to survey questions if they participated in the survey.

*An Example of a "Gold Standard" Validation of a Survey Response Average*

82. Another common criticism contained in defense experts' reports is that survey respondents will suffer from memory issues, leading to inflated survey responses that will cause defendants to overpay for damages. A survey I conducted in a class action wage and hour case in 2019 directly contradicts this claim. The case is *Aldapa v. Fowler Packing*.[67] In the *Aldapa* matter I was able to perform a "gold standard" validation because the "true recorded values" could be compared with the survey responses.[68] The survey participants were farm workers that performed piece-rate work that involved picking fruit. During the first four years and seven months of the class period, the class members were only paid for the actual pieces of fruit they picked, but they were also required to perform pre-shift, mid-shift, and post-shift work related to their picking (hereafter "non-productive time") for which they were not compensated. This changed in November 2015. They still had to perform non-productive work but began being

---

[66] Ibid., page 670.
[67] *Beatrice Aldapa et al. v. Fowler Packing Company, Inc. et al.* (case number: 1:15-CV-00420-DAD-SAB).
[68] Source: Groves, Robert M. et al. 2009. *Survey Methodology*, New Jersey: John Wiley and Sons, Inc., page 417.

42

paid for this work time, which was documented in a payroll code titled "non-productive time."

The class period ended in June 2018, so there are two years and eight months of payroll data for

non-productive time.  The survey participants were asked to estimate their pre-shift, mid-shift

and post-shift non-productive time during the entire class period.  The average of their estimates

was 38.4 minutes.  The payroll data showed an average of 39.2 minutes.  <u>Therefore, the survey</u>

<u>responses were almost exactly equivalent to the actual data.</u>[69]

## VI.  Conclusion

82.  In summary, a survey can be conducted in this matter to determine if class members

performed off-the-clock/unpaid work during their meal periods.  The survey responses will show

the frequency that class members were on-call during their meal periods.  The survey responses

will also show the frequency that meal periods were interrupted by work requirements and the

average duration of the interruptions.  The survey will conform to generally accepted scientific

principles established by the relevant scientific community of survey experts and statisticians.

The survey responses can be utilized as part of the determination of liability, and to project class-

wide damages and penalties.

83. The validity and reliability of the survey data are determined by the survey method, the

survey questionnaire and the analysis of the survey data.  Based on my review of the issues in

this matter, and my considerable experience in designing surveys and analyzing survey data in

class action wage and hour cases, it is my conclusion that a survey conducted in this matter will

yield valid and reliable data.

---

[69] This is the only wage and hour survey I have conducted where a "gold standard" validation process could be conducted.

84.  I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on February 8, 2024 at Oakland, California.


_____

Jeffrey S. Petersen, Ph.D.

# EXHIBIT A

# JEFFREY S. PETERSEN

Allman & Petersen Economics, LLC                             Phone: (510) 382-1550
7677 Oakport Street, Suite 610                                 FAX: (510) 382-1472
Oakland, CA 94621                               E-mail: jeff@allmaneconomics.com

## EMPLOYMENT HISTORY

2003 – present      ***Partner***
                    Allman & Petersen Economics, LLC
                    Oakland, California

2014 – present      ***Adjunct Associate Professor of Economics***
1999 – 2001         St. Mary's College
                    Moraga, CA

1998 – 2003         ***Senior Economist***
                    U.S. Government Accountability Office (formerly the General Accounting Office)
                    San Francisco, California

1999 – 2001         ***Economics Instructor***
                    Golden Gate University
                    San Francisco, California

1995 – 1998         ***Postdoctoral Fellow***
                    University of California, Berkeley

1990 – 1995         ***Research and Teaching Assistant***
                    University of Utah
                    Salt Lake City, Utah

## EDUCATION

1996                Postdoctoral Training Program in Health Economics
                    University of California, Berkeley

1995                Ph.D. in Economics, University of Utah

1989                B.A. in Economics, San Jose State University

## PUBLICATIONS

***Peer-Reviewed Book***

> *"Carve-outs" in Workers' Compensation: An Analysis of the Experience in the California Construction Industry,* W.E. Upjohn Institute for Employment Research, Kalamazoo, MI 2003 (co-authored with David Levine, Frank Neuhauser, Richard Reuben, and Christian Etcheverria).

*Peer-Reviewed Journal Articles*

"The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019 (co-authored with Phillip Allman).

"The Effect of the Intent to Retire at Age 70 or Older on Work Life Expectancy," *Journal of Legal Economics*, Volume 23, No. 2, April 2017 (co-authored with Phillip Allman).

"Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Respondents," *Journal of Legal Economics*, Volume 22, No. 1, October 2015 (co-authored with Phillip Allman and William Lee).

"Carve-Outs from the Workers Compensation System," *Journal of Policy Analysis and Management*, 2002, Volume 21, No. 3, (co-authored with David Levine and Frank Neuhauser).

"Health Care and Pension Benefits for Construction Workers: The Role of Prevailing Wage Laws," *Industrial Relations*, 2000, Volume 39, No. 2.

"A Comparison of Health Outcomes Among Older Construction and Blue-Collar Employees in the United States," *American Journal of Industrial Medicine*, 1998, Volume 34, No. 3, (co-authored with Craig Zwerling).

*Other Publications*

"The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," proceedings of the 2019 Allied Social Sciences Association, National Association of Forensic Economics Section (co-authored with Phillip Allman).

"International Responses to an Aging Labor Force," *Work Options for Mature Americans*. Teresa Ghilarducci and John Turner eds., Notre Dame, Indiana: University of Notre Dame Press, 2005. (co-authored with Charles Jeszeck, Anthony Defrank, Katherine Leavitt, Janice Peterson, Yunsian Tai, and Howard Wial).

"Benefits vs. Wages: How Prevailing Wage Laws Affect the Mix and Magnitude of Compensation to Construction Workers," in *The Economics of Prevailing Wage Laws*, Peter Philips and Hamid Azari eds., Ashgate Publishing, 2005. (co-authored with Erin Godtland).

"Private and Public Sector Employment Policies to Extend the Labor Force Participation of Older Workers," *Proceedings of the 55th Annual Industrial Relations Research Association Annual Conference, 2003.*

"Return to Economic Productivity Following Acute Traumatic Injury: The Influence of Financial, Physical, and Psychosocial Factors," *Proceedings of the American Association for the Surgery of Trauma Fifty-Ninth Annual Meeting,*1999, (co-authored with Lara Papadakis, Diane Morabito, Herb Ochitill, Alicia Bocellari, and Robert Mackersie).

*Portable Pensions for Casual Labor Markets: Lessons from the Operating Engineers Central Pension Fund*, Quorum Books, Westport, CT, 1996 (co-authored with Teresa Ghilarducci, Garth Mangum, and Peter Philips).

### *Selected General Accounting Office Reports*

"Older Workers: Policies of Other Nations to Increase Labor Force Participation," GAO-03-307, Feb. 2003

"Older Workers: Demographic Changes Pose Challenges for Employers and Workers," GAO-01-85, Nov. 2001

"Characteristics of Persons in Labor Force Without Pension Coverage," GAO/HEHS-00-131, Aug. 2000

"Social Security Reform: Implications of Raising the Retirement Age," GAO/HEHS-99-112, Aug. 1999

## REVIEWER FOR PEER-REVIEWED JOURNALS AND BOOKS

Industrial Relations (University of California, Berkeley)

Perspectives (peer-reviewed section of the Social Security Bulletin)

Journal of Legal Economics

Palgrave Macmillan, Economics & Business Publications

The Earnings Analyst

## PRESENTATIONS

"Profiles in Survey Research: The Intersection of Public Opinion and the Law," Panelist, Pacific Chapter of the American Association of Public Opinion Research, November 2023.

"The Reference Guide on Survey Research," Western Economic Association Annual Conference, San Diego, CA, July 2023.

Chair for Session "The Reference Manual on Scientific Evidence," Western Economic Association Annual Conference, San Diego, CA, July 2023.

"Statistical Evidence in Wage and Hour Class Actions," Webinar hosted by Strafford Publications, June 2023.

"Gold Standard Validation of Survey Responses in a Wage and Hour Class Action: The Case of Aldapa vs. Fowler Packing," Fall Forensic Economics Workshop, South Lake Tahoe, CA, October 2022.

"Supreme Court Decisions in Class Action Wage and Hour Cases," Western Economic Association Annual Conference, July 2022.

"Wage and Hour Surveys: Assisting with the Liability Determination and Assessing Nonresponse Bias," 32nd Annual Meeting of the American Academy of Economic and Financial Experts, April 2021.

"Statistical Evidence in Wage and Hour Class Actions Since Tyson Foods: Impact on Certification and Trial," Webinar hosted by Strafford Publications, June 2020

"The Implications of Recent Legal Decisions for Survey Methodology in Class Action Wage and Hour Cases," Annual Conference of the Pacific Chapter of the American Association for Public Opinion Research, San Francisco, CA, December 2019.

"Duran Duran: The Important Issues in the Two Duran Decisions for Surveys and Statistical Analysis," Western Economic Association Annual Conference, San Francisco, CA, June 2019.

"The Margin of Error on Damages Calculations in Class Action Wage and Hour Cases," Allied Social Science Associations Annual Conference, National Association of Forensic Economics, Atlanta, GA, January 2019.

"Survey Design and Analysis in Class Action Wage and Hour Cases," Annual Conference of the Pacific Chapter of the American Association for Public Opinion Research, San Francisco, CA, December 2018.

"Surveys in Class Action Wage and Hour Cases," CLE Seminar, San Francisco, CA, October 2018.

"Using Surveys to Assess Damages in Class Action Wage and Hour Cases," 30th Annual Meeting of the American Academy of Economic and Financial Experts, Las Vegas, NV, April 2018.

"Working to Age 70 or Older – How Much Does Intention Matter?  Evidence from the Health and Retirement Study," 28th Annual Meeting of the American Academy of Economic and Financial Experts, Las Vegas, NV, March 2016.

"Policies to Extend the Labor Force Participation of Older Workers" – Industrial Relations Research Association Section of the Allied Social Sciences Association Annual Meeting, Washington, DC, Jan. 2003.

Discussant for the panel "The Population Age 50-70 -- Past Trends and Future Projections" at the National Academy of Social Insurance conference on the Implications of an Aging Workforce for Income Security and Employee Benefits, Washington, D.C., Nov. 2001

"Raising the Eligibility Ages for Social Security Benefits: Work and Health Issues Associated with this Policy Change" - School of Public Policy, University of California, Los Angeles, Jan. 2001

"The Labor Market for Older Workers" - Bay Area Labor Economists Fall Workshop, Public Policy Institute of California, San Francisco, CA, Nov. 2000

"Raising the Eligibility Ages for Social Security Benefits: An Analysis of the Policy Implications" - Association for Public Policy Analysis and Management Annual Research Conference, New York, NY, Oct. 1998.

"Carving Out Construction Employees from the Workers Compensation System in California: Putting Theory into Practice" - Industrial Relations Research Association Section of the Allied Social Sciences Association

Annual Meeting, Chicago, IL, Jan. 1998
- National Occupational Injury Research Symposium, National Institute of Occupational Safety and Health, Morgantown, WV, Oct. 1997

"Return to Work Following Acute Traumatic Injury"
- American Association for the Surgery of Trauma Annual Meeting, Boston, MA Sept. 1999
- National Occupational Injury Research Symposium, National Institute of Occupational Safety and Health, Morgantown, WV, Oct. 1997

"Health Care and Pension Benefits for Construction Workers: The Role of Prevailing Wage Laws"
- Health Economics Research Organization Section of the Allied Social Sciences Association Annual Meetings, New Orleans, LA, Jan. 1997

"Retirement from the Construction Industry" – University of California, Berkeley, Department of Demography, May 1995.

## HONORS

| | |
|---|---|
| Vice President, American Academy of Economic and Financial Experts | 2022-present |
| Member of the Board of Directors, American Academy of Economic and Financial Experts | 2017-2020 |
| National Research Service Award, Public Health Postdoctoral Fellowship, U.S. Department of Health and Human Services | 1995-1997 |
| Outstanding Scholar Athlete Honor Roll, San Jose State University | 1988-1989 |
| NCAA Division I Tennis Team, San Jose State University | 1987-1989 |

## PROFESSIONAL ORGANIZATIONS

American Economic Association

National Association of Forensic Economics

American Academy of Economic and Financial Experts

American Association for Public Opinion Research

Western Economic Association International

*Jeffrey S. Petersen, page 5 of 5*

# ALLMAN & PETERSEN ECONOMICS, LLC

Phillip H. Allman, Ph.D.
Jeffrey S. Petersen, Ph.D.
Max Allman, MA, CFA

7677 Oakport Street, Suite 610 • Oakland, CA 94621
TEL (510) 382-1550

## FEE SCHEDULE (1/5/22)

(1) Economic research and analysis, report preparation, document review, office and client consultations, deposition preparation and trial preparation.[1]

| | |
|---|---|
| -- Ph.D. Economist | $600 / hour |
| -- Senior Economist | $425 / hour |
| -- Economist or CPA | $275 / hour |
| -- Survey Administration | $125 / hour |

(2) Deposition testimony[2]

| | |
|---|---|
| -- Ph.D. Economist | $750 / hour |
| -- Senior Economist | $500 / hour |

(3) Arbitration and trial testimony[3]

| | |
|---|---|
| -- Ph.D. Economist | $750 / hour |
| -- Senior Economist | $500 / hour |

(4) Travel time                                    $250 / hour

---

[1] Bills will be submitted periodically and are due upon presentation, not at the conclusion of the case.

[2] Payment for deposition testimony shall be paid in accordance with C.C.P. '2034 (i) (3) --i.e. payment of an expert's fees for the anticipated length of a deposition shall be paid at the commencement of his/her deposition, and any outstanding balance shall be paid within five days of receiving an itemized statement of the expert's services.

[3] All invoices to date must be paid prior to trial testimony. In addition, an additional retainer must be paid prior to the trial testimony based upon the estimated invoice for the testimony.

**Trial & Deposition List for Jeffrey S. Petersen (Last Four Years)**

| | Case | Case Number | Jurisdiction | Date |
|---|---|---|---|---|
| **Trials & Arbitrations** | Yumul et al. v. Indus Investments et al. | BC565881 | Los Angeles | April, 2018 |
| | Zarate v. Sungrow USA Corporation | 01-18-0003-8025 | American Arbitration Association | September, 2019 |
| | Dezan v. Dignity | CIVDS1516658 | San Bernardino | September, 2021 |
| | Chavez, et al. v. California Collision | RG17865765 | Alameda | August, 2022 |
| | Vasquez v. Leprino Foods | 1:17-cv-00796-AWI−BAM | Eastern District of California | March, 2023 |
| | Carroll v. City and County of SF | CGC-17-562580 | San Francisco | April, 2023 |
| **Depositions** | Zarate v. Sungrow USA Corporation | 01-18-0003-8025 | American Arbitration Association | June, 2019 |
| | Dueker et al. v. CRST Expedited | 2:18-cv-08751-FMO-FFM | Central District of California | September, 2019 |
| | Nevarez et al. v. Costco Wholesale Corp. | 2:19-cv-03454-SVW-SKx | Northern District of California | January, 2020 |
| | Sephora Wage and Hour Cases | CGC-16-550894 | San Francisco | June, 2020 |
| | Dhawan v. Regents of the Univ. of CA | RG18911598 | Alameda | October, 2020 |
| | Van Bebber v. Dignity Health | 1:19-cv-00264-DAD-EPG | Eastern District of California | October, 2020 |
| | Ayala v. UPS Supply Chain Solutions | 5:20-cv-00117-PSG-AFM | Central District of California | February, 2021 |
| | Christensen v. Carter's Retail | 8:20-cv-00776 JLS (KESx) | Central District of California | April, 2021 |
| | Nucci v. Rite Aid | 19-CV-01434-LHK | Northern District of California | June, 2021 |
| | Crump v. Hyatt | 4:20-cv-00295-HSG | Northern District of California | June, 2021 |
| | Dezan v. Dignity | CIVDS1516658 | San Bernardino | August, 2021 |
| | Williams v. Saint Joseph's | 30-2020-01134268-CU-OE-CXC | Orange | September, 2021 |
| | Johnson v. Bakersfield Memorial | BCV-19-102016 | Kern | October, 2021 |
| | Powell v. Saint Joseph's | STK-CV-UOE2019-0011155 | San Joaquin | October, 2021 |
| | Castillo v. Western Range | 3:16-cv-00237-RJC-VPC | District of Nevada | November, 2021 |
| | Cruz v. Bruceville Terrace | 34-2018-00245506 | Sacramento | November, 2021 |
| | Larson v. Mark Twain Medical Center | 19CV44062 | Calaveras | November, 2021 |
| | Aldapa v. Fowler Packing | 1:15-CV-00420-DAD-SAB | Eastern District of California | December, 2021 |
| | Vasquez v. Leprino Foods | 1:17-cv-00796-AWI−BAM | Eastern District of California | January, 2022 |
| | Hinds v. Fedex Ground | 3:18-cv-01431-JSW (EDL) | Northern District of California | March, 2022 |
| | Rodriguez v. Walmart | 2:20-cv-07045 AB(KKx) | Central District of California | May, 2022 |
| | Sanchez v. Sam's West, Inc. | 2:21-cv-05122-SVW-JC | Central District of California | May, 2022 |
| | Cruz v. Talentscale | RIC1821842 | Riverside | May, 2022 |
| | Villanueva v. Select Employment Services | 3:17-cv-06875-JCS | Northern District of California | September, 2022 |
| | Perez v. Leprino Foods | 1:17-cv-00686-AWI-BAM | Eastern District of California | October, 2022 |
| | Stafford v. Bojangles Restaurants | 3:20-cv-266-MOC | Western District of North Carolina | October, 2022 |
| | Dieves v. Butte Sand Trucking | CVCS19-0001082 | Sutter | November, 2022 |
| | Adelman v. Starbucks | 3:20cv-01178-JD | Northern District of California | February, 2023 |
| | Carroll v. City and County of SF | CGC-17-562580 | San Francisco | March, 2023 |
| | Castro v. Gardner Trucking | 4:20cv-05473-YGR | Northern District of California | April, 2023 |
| | Villegas v. Duarte Nursery | 2014212 | Stanislaus | May, 2023 |
| | Ames v. San Antonio Regional Hospital | CIVDS2018953 | San Bernardino | May, 2023 |
| | Porcayo v. So Cal Land Maintenance | 30-2021-01236054-CU-OE-CXC | Orange | September, 2023 |
| | Charles v. Varsity Tutors | 19CV347249 | Santa Clara | October, 2023 |
| | Carbajal v. Imperial Maintenance Services | STK-CV-UOE-2016-0001100 | San Joaquin | October, 2023 |
| | Torres v. Johnston Nurseries | BCV-19-100830 TSC | Kern | December, 2023 |
| | Cruz v. Talentscale | RIC1821842 | Riverside | January, 2024 |
| | Sanchez v. Sam's West, Inc. | 2:21-cv-05122-SVW-JC | Central District of California | January, 2024 |