## EXPERT REBUTTAL REPORT OF JOSEPH A. KROCK, Ph.D.

**Table of Contents**

I.   INTRODUCTION ................................................................................................. 2

II.   ASSIGNMENT ................................................................................................... 4

III.  BACKGROUND ................................................................................................. 4

IV.  SUMMARY OF CONCLUSIONS .................................................................... 5

V.   DISCUSSION ..................................................................................................... 8

    A.     No Statistical Method Exists for Assigning Liability to Non-Sampled Class Members. 8

    B.     Dr. Petersen's Survey Will Fail to Produce Reliable Responses ................................... 11

    C.     Dr. Petersen's Sampling Plan is Fatally Flawed ............................................................ 19

    D.     Dr. Petersen's Sample Size is too Small to Provide Reliable Results Regarding Liability or Damages ................................................................................................................. 22

    E.     Dr. Petersen's "Gold Standard" Validation is Irrelevant and Incorrect ......................... 23

VI.  CONCLUSION ................................................................................................... 24

## I.    INTRODUCTION

1.    My name is Joseph A. Krock, Ph.D. I reside in Los Angeles County, California. I am an economist and Managing Director of Stout, a global investment bank and advisory firm specializing in corporate finance, transaction advisory, valuation, financial disputes, claims and investigations. My office is located in Los Angeles, California.

2.    I earned Master of Arts and Doctorate Degrees in Economics from the University of Chicago, and a Bachelor of Arts Degree in Economics-Mathematics from the University of California, Santa Barbara. I have extensive training in statistical and econometric methods at both the undergraduate and graduate level. I have served as a lecturer in Economic Theory at the University of Chicago, and I regularly speak before professional groups regarding, among other topics, the use of sampling and statistics in litigation, database management and analysis, and damages calculation.

3.    I lead the Economic Consulting Practice at Stout, and I have been retained in connection with various types of litigation including wage and hour class and collective actions, consumer class actions, as well as antitrust, intellectual property, and breach of contract matters. I have testified in numerous cases in which class certification and economic damages were at issue. Prior to joining Stout, I worked for The Claro Group, which was acquired by Stout; Micronomics, Inc.; and Deloitte & Touche, LLC, performing similar duties to those I am currently performing for Stout.

4.    My experience with class and collective actions extends over 24 years. I have been retained by numerous clients to provide testimony regarding suitability and feasibility of calculating liability and damages on a class-wide basis for both wage and hour class actions and consumer class actions. I regularly review complex databases and provide opinions as to the relevance of those databases in facilitating the class process. I also have been retained to review and perform statistical surveys and to opine on the statistical opinions of others derived from survey research. My opinions and support work have been used in numerous class certification disputes. Broadly speaking, my industry experience includes, among others, consumer products,

building products, healthcare, commercial and residential services, financial services, agriculture, manufacturing, oil and gas, and transportation.

5.      I have been designated as an expert witness and testified at trial and in depositions as an expert witness in several cases, including wage and hour cases, in state and federal district courts in California, Florida, Illinois, Louisiana, Minnesota, Nevada, New Jersey, and Oregon, including Federal Multi-District Litigation ("MDL") matters. I have been retained as an expert in more than 100 cases in state and federal courts in California, Florida, Illinois, Louisiana, Minnesota, Nevada, New Jersey, New York, Oregon, and Wisconsin.

6.      I have been involved with numerous projects requiring the preparation of surveys, both written and oral, and random sampling plans. For example, I performed the support work for Farmers Insurance Exchange in the *Bell v. Farmers Insurance Exchange* matter (herein, "*Bell*")*,* where a sampling and survey plan was used to estimate aggregate damages after the Court determined liability. My duties in *Bell* included, among other things, preparing sample-size calculations; selecting sample members; drafting, with counsel for defendant, deposition question scripts; directing the review of deposition transcripts to create the database used for the damages analysis; participating in meet-and-confer sessions to discuss differences in the interpretation of deposition testimony, and performing the damages analysis of the sample and class as a whole.

7.      I also rely upon my training and experience as an economist, statistician, and expert witness. I have been involved in class action litigation matters for approximately 24 years. My experience in these matters involves pre-trial exposure calculations, class certification analysis, review of trial plans and methods related to statistical sampling and surveys, the execution of surveys and interpretation of results, damages and liability calculations, and post-trial claims-made processes.

8.      My curriculum vitae, including a list of all publications I authored in the previous ten years and a list of all other cases in which I have testified as an expert at trial or by deposition in the last four years, is attached at Exhibit A.

## II.    ASSIGNMENT

9.    I have been retained by Holland & Knight, counsel for Acadia Laplace Holdings, LLC, (herein, "LaPlace" or "Defendant"), to review the *Fed. R. Civ. P. 26(a)(B) Report of Plaintiffs' Survey and Statistical Expert for Class Certification, February 8, 2024* ("Petersen Report"), the supporting materials produced by Dr. Petersen, and various other documents, and to provide my opinion as to the accuracy and reliability of the proposed sampling and survey plan presented by Dr. Petersen.

10.    Stout is being compensated for my time in this matter at a rate of $750 per hour. I have been assisted by members of my staff whose rates may range from $275 to $1,000 per hour. My compensation is not dependent on my opinion or the outcome of this litigation.

## III.    BACKGROUND

11.    I understand Plaintiffs are asking the Court to certify a Rule 23 class of approximately 600 non-exempt workers employed by LaPlace from November 2014 through the present (herein, "the Class"), and Defendant has asked the Court to decertify the current FLSA collective, which consists of 17 total individuals who would also be members of the putative Class.  I also understand counsel for Plaintiff retained Dr. Petersen to "assess whether a survey will provide valid and reliable data regarding the frequency and duration of off-the-clock/unpaid work during meal periods," and he has produced the Petersen Report regarding the same.[1]

12.    Dr. Petersen concludes in his Report that "the responses to survey questions will assist the trier-of-fact in making liability and damages determinations regarding unpaid wages due to class members for work being performed off-the-clock during meal periods."[2] Dr. Petersen then describes a two-phase sampling plan that specifies a random sample of 40 putative

---

[1] *Fed. R. Civ. P. 26(a)(2)(B) Report of Plaintiff's Survey and Statistical Expert for Class Certification, February 8, 2024* ("Petersen Report"), p. 1.
[2] *Ibid.*

class members for the first phase[3] and "as many survey responses as possible from the population"[4] for the second phase.

## IV.    SUMMARY OF CONCLUSIONS

13.    Dr. Petersen's proposed sampling and survey plan is problematic and will not lead to valid or reliable information that would assist the trier-of-fact in drawing any conclusions about the putative Class. At a fundamental level, Dr. Petersen's methodology cannot, by itself, prove or even support a finding of liability. Dr. Petersen's proposed survey plan, however, incorrectly assumes that all class members were harmed and damages are owed to all class members (effectively assuming liability), and he relies on this false assumption to claim that a sampling survey can provide valid results. For example, even a moderate level of response from some survey respondents indicating that they did not have regularly interrupted meal periods would indicate that this issue is not universal or appropriate for class treatment. The record in discovery—which will always be more reliable than a sampling survey—demonstrates that at least 9 putative class members out of the 22 who have provided deposition testimony never or rarely had an interrupted meal break, and cannot have been harmed under Plaintiffs' theory of the case. This testimony shows that any sampling that assumes damages to the entire class cannot be reliable. The Court will thus be forced to create an *ad hoc* level of "harm" or ignore the variety of unique circumstances among the class members to utilize Dr. Petersen's survey with respect any liability determinations.

14.    The testimony and written discovery responses provided by various putative class members also indicates that there will be significant comprehension issues that Dr. Petersen will not be able to overcome with a simple survey and that would preclude the survey from generating any reliable information. Primarily, based on their discovery responses and deposition testimony, the members of the FLSA collective appear to have various interpretations for how

---

[3] Dr. Petersen cites two different sample sizes in paragraph 63, and it is unclear whether he intends the first phase to be 30 or 40 class members. *Petersen Report*, p. 34.
[4] *Petersen Report*, p. 1.

they believe they were harmed and what is meant by "off-the-clock work," "automatic deductions," "working through lunch," or "on-duty" meal breaks. Some plaintiffs believed that they were harmed because they were unable to take a meal break at all, but they were always paid for that time, which I understand is not a violation of the FLSA or any Louisiana law. Others believe that there were automatic meal deductions that reduced the amount for which they were compensated, while others state no such deductions occurred. Further, a review of the time and pay records proves that automatic deductions did not ever occur. Dr. Petersen's simplistic written questions therefore cannot provide the detail necessary for the Class members to truly understand the question to which the respondent is responding.

15.     Class member deposition testimony also provides several other strong indications that there will be comprehension issues among the respondents of any survey, including their inability to remember events that occurred years ago, their expressed inability to understand the questions asked in Defendants' Interrogatory Requests, and their inability to provide consistent answers between the interrogatory responses and deposition testimony. These are all indicators that a simple survey—with questions that will be similar to those in Defendant's Interrogatory Requests—will be insufficient to provide reliable data. Given the discrepancies between the interrogatory responses and deposition testimony to date, I would expect that if Defendants were to subpoena all survey respondents, there would be a similar level of inconsistency between survey responses and subsequent deposition testimony, which would further degrade the supposed reliability of Dr. Petersen's survey results.

16.     A comparison between the opt-in plaintiffs' discovery responses and their time clock records also illustrates just how unreliable their memory—which is what is being collected by a survey—is concerning the frequency of meal break interruptions from years ago. For example, Tanya Charles-Morris stated in her responses to Defendants' Interrogatory Requests that her 30-minute meal period was automatically deducted, which again was not the case.[5]

---

[5] *Plaintiff Tanya Charles-Morris' Responses to Defendants' First Set of Interrogatories, Requests for Production, and Requests for Admission.*

Furthermore, she testified in her deposition that she never used a timeclock to clock out or in for meal periods.[6] However, her time records show that she did clock out and back in for meals on 6 of her 22 shifts. Furthermore, she also testified that she regularly worked a 12-hour shift, but her time records show that she only worked a single shift over nine hours during her entire employment and averaged approximately 3.5 hours per shift.[7]  Similarly, Sabena Stevenson stated in her responses to Defendants' Interrogatory Requests that 95% of her meal breaks were interrupted.[8] Her time records, however, show that out of the 63 times she clocked out for a meal break, 59 of those breaks (94%) were at least 27 minutes long, and thus were not interrupted.[9] Therefore, although she claims 95% of meal breaks were interrupted and would report the same in a survey, in actuality, 6% or less of her meal breaks could have even possibility been interrupted.

17.    Additionally, Dr. Petersen's plan is problematic because he proposes a non-random sampling plan for a portion of the responses. Basic statistical methodology dictates that certain conditions need to be present that then gives us, as statisticians, the ability to describe the likelihood that a sample statistic is close to the "true" or population value. Once a statistician veers from a probability sampling model (one of the primary conditions), there are no safeguards or guarantees that the responses are representative of the underlying population. Furthermore, given the small sample sizes proposed by Dr. Petersen, it is unlikely that any one of his "tests," regardless of randomness, would be able to detect a difference—even if a fairly large difference exists.

18.    Furthermore, Plaintiffs are seeking to certify a Class that includes many different jobs and responsibilities, including "nursing staff, nurses, nursing assistants, nurse aids, technicians, clerks, non-exempt therapists, or other non-exempt employees with similar duties

---

[6] *Deposition of Tanya Charles-Morris*, January 4, 2024, 40:14-42:12.
[7] *Ibid.*, 52:7-55:11.
[8] *Plaintiff Sabena Stevenson's Responses to Defendants' First Set of Interrogatories, Requests for Production, and Requests for Admission.*
[9] Hamm_Ochsner-Acadia_006843-51.

employed at any facility owned/operated by Defendants in Louisiana."[10] The depositions of various Collective Members shows that duties and responsibilities vary not only by job but also by shift time, shift length, and time period. Dr. Petersen's methodology does not, nor can it, account for any of these differences among the various positions, shifts, or time periods. Additionally, the small sample size set forth by Dr. Petersen is woefully inadequate to statistically identify differences across these characteristics. Dr. Petersen's methodology will thus not result in valid or reliable data that could assist the trier-of-fact.

19.     Finally, Dr. Petersen's "Gold Standard" Validation section regarding an unrelated lawsuit is irrelevant to this case and not actually a validation of anything. As both the Court and Plaintiffs' counsel in that matter recognized notwithstanding the claims of Dr. Petersen, "there is certainly risk associated with litigating to trial a random sample survey conducted by Plaintiffs' expert, and whether a trier of fact would accept the survey and the conclusions drawn from the survey as reliable evidence of damages."[11] Further, in this report, I provide a robust rebuttal to Dr. Petersen that shows his "validation" was an inappropriate comparison and, at best, purely coincidental.

## V.     DISCUSSION

### A.     No Statistical Method Exists for Assigning Liability to Non-Sampled Class Members

20.     Dr. Petersen's fundamental problem is that, if a sample survey shows a moderate number of respondents are not harmed, there is no statistical methodology that even could be used to assign which of the non-sampled class members were harmed and which are not, indicating that the alleged off-the-clock work is not a class-wide issue. As he repeatedly states, survey statistics have been used to calculate aggregate ***damages*** on a class-wide basis, as was

---

[10] *Second Amended Class and Collective Complaint*, p. 10.

[11] *Order Granting Motion for Final Approval of Class Action Settlement and Granting Motion for Attorneys' Fees, Costs, and Incentive Award*, Beatriz Aldapa, et al., v. Fowler Packing Company, Inc., US. District Court, Eastern District of California, No. 1:15-cv-00420-ADA-SAB, June 5, 2023, p. 8, citing Plaintiffs' motion for final approval of class action settlement.

done in the *Bell v. Farmers Insurance* case.[12] However, Dr. Petersen fails to state the distinguishing factor of *Bell* in that **liability and class treatment** were determined **before** any sampling or survey work was undertaken. The *Bell* survey statistics were focused solely on estimating damages (*i.e.*, unpaid overtime hours worked) after liability for all class members and the appropriateness of class treatment had already been established. The survey did not and could not have been used to assist the trier-of-fact in determining liability or the suitability of class treatment in the first instance.[13]

21.     In this matter, it is not known how many class members would state that they were not harmed. As a result, unless a blanket determination of liability is reached—or simply assumed as proposed by Dr. Petersen—there are no statistical methods to assign liability to the non-sampled class members allegedly harmed by Defendant.

22.     The known facts from discovery, however, show that any class-wide liability assumption would be incorrect. To date, seven putative class members have testified that they never had an interrupted meal break as they either received all (or nearly all) of their uninterrupted meal breaks or never received a meal break and were compensated for all of their hours worked. My understanding is that that in these cases, there is zero liability with regard to the claim of off-the-clock work during "on-duty" meal periods. For example, Named Plaintiff Amy Hamm testified that she was never able to take a break and that she was always paid for her time when she skipped meal breaks.[14] Similarly, Named Plaintiff Joye Wilson testified that before there were patients at the facility, she never once had an interrupted meal break and then after there were patients, she never took a meal break—demonstrating she never had an interrupted or interruptible meal break.[15] Opt-in Plaintiff Bettina Schreiner also testified that she did not clock out for any meal breaks and thus was always on the clock and compensated during

---

[12] *Bell v. Farmers Insurance Exchange*, 9 Cal.Rptr.3d 544 (Cal App. Ct. 2004).
[13] It should be noted that 28 of 295 (9.5%) of the survey respondents testified to having never worked overtime in that case, indicating that class treatment was not in fact appropriate.
[14] *Deposition of Amy Hamm*, January 24, 2022, 35:1-14.
[15] *Deposition of Joye Wilson*, September 22, 2023, 96:23-97:4, 117:20-118:8.

times when she ate on the job.[16] Further, putative class members, Erica Lewis, Jolondra Tate, Kyla Clark, and Kenya Fredericks all provided deposition testimony, written declarations signed under the penalty of perjury, or both stating that they were consistently able to take 30-minute uninterrupted meal breaks and were never or almost never interrupted. This testimony indicates that at a significant portion of the putative class will testify or respond to a survey indicating that they did not have "on-duty" meal breaks. Additionally, the time records of two other opt-in plaintiffs show that they too have no claim under Plaintiffs' theory of the case as they simply could not have had a sufficient number of meal breaks interrupted to assert a valid claim. Daria Moore's time records show that she clocked out for 23 meal breaks during her shifts at LaPlace, and every single one of those breaks were at least 27 minutes in length.[17] Similarly, Sabena Stevenson's time records indicate that she clocked out for 63 meal breaks during her shifts at LaPlace, and 59 of those breaks (94%) were at least 27 minutes.[18] Even assuming that all of the other 22 putative class members who have provided testimony with varying level of alleged interruptions in this case testified to a sufficient level of interruption that could at least arguably create an issue of fact concerning whether they were harmed, the proportion of indisputably unharmed employees from this sampling is 41% (*i.e.*, 9 / 22). While the sample size is not large (and obviously not random as the majority of these individuals are those who either chose to opt into or be lead plaintiffs in the collective action and are more likely to claim harm), these answers are more reliable than any survey response and this percentage is substantial and indicates that off-the-clock work for on-duty meal breaks is not a class-wide issue.

23.     Under very specific conditions, statistics can provide useful information regarding populations as a whole, but it cannot distinguish or predict the responses of any particular individual without additional information. This principle is shown in the simple flip of a coin. In repeated flips of a coin, statistics can tell us that there is a 50% chance of a head (or tail) result,

---

[16] *Deposition of Bettina Schreiner*, September 28, 2023, 101:21-102:21.
[17] Hamm_Ochsner-Acadia_007519-38.
[18] Hamm_Ochsner-Acadia_006843-51.

however statistics cannot tell us whether the next flip will result in a head or a tail. The same applies when sample statistics show that 41% of a class is not affected. Statistics can tell us that approximately 41% of the non-sampled portion of the class are also not likely affected, but statistics cannot identify which of the non-sampled members of the class are not affected.

24.     The only method available to identify and distinguish non-harmed individuals from harmed individuals would be to ask every single class member about their specific experiences and compare those answers to their individual time clock records. This individual inquiry counsels against class treatment and demonstrates that the "employment issues" Dr. Petersen was asked to investigate cannot be accurately captured or demonstrated by a sample survey.

### B.     Dr. Petersen's Survey Will Fail to Produce Reliable Responses

25.     Dr. Petersen asserts that his survey will generate reliable information that will assist the trier-of-fact in reaching several material conclusions. However, even setting aside the impossibility of a sampling survey assisting in establishing liability discussed above, the testimony from the putative class members during discovery in this case shows that Dr. Petersen's methodology will not result in reliable information. Furthermore, there are a number of assumptions and procedures Dr. Petersen prescribes that are contrary to standard statistical methods and will compromise any results and conclusions he intends to reach after his survey is completed.

26.     For example, Dr. Petersen cites the interrogatory responses of Winnesha Harrison, along with the written responses of 28 other putative class members as support for the claim that Plaintiffs would be able to "answer survey questions regarding off-the-clock work time during meal breaks during their employment with Defendants."[19] Unfortunately, or perhaps tellingly, Ms. Harrison did not sit for a deposition where it was possible to ask her follow up questions or

---

[19] *Petersen Report*, p. 9.

clarify what she meant in her written responses. It is thus not possible to know what questions she believed she was answering or what she meant by her answers.

27.    Dr. Petersen simply waves this away with the conclusory assertion that "comprehension of the questions is not likely to be an issue."[20] However, I reviewed the interrogatory responses for the 17 putative class members who also provided deposition testimony along with their deposition transcripts, which tell a different story. It is clear from the deposition testimony that many putative class members had different understandings about what circumstances the questions in the interrogatories referenced. In fact, many of the opt-in plaintiffs directly contradicted the sworn testimony in their interrogatories in their depositions. Furthermore, many also testified that they found it difficult to remember circumstances that existed up to six years ago. These issues clearly show that comprehension of survey questions will in fact be a significant issue and any survey results will not be reliable.

### *Theory of Harm*

28.    As noted above, Named Plaintiff Amy Hamm testified that she never took a meal break, and thus never had one interrupted.[21] The other Named Plaintiff, Joye Wilson, similarly testified that she never had a meal break interrupted because she was either consistently able to take an uninterrupted meal break before there were patients or never took a meal break after there were patients.[22] It can only be inferred that their theory of harm is thus something other than the on-duty and compensable meal breaks that Plaintiffs have sought to certify.

29.    If they or someone with a similar belief responded to the survey, their responses would not be appropriate to apply to other members of the putative class who had different beliefs as to why they were harmed.  And in fact, numerous individuals like Bettina Schreiner,[23]

---

[20] *Ibid.*, p. 27.
[21] *Deposition of Amy Hamm*, January 24, 2022, 35:4-14.
[22] *Deposition of Joye Wilson*, September 22, 2023, 96:23-97:4, 117:20-118:8.
[23] *Deposition of Bettina Schreiner*, September 28, 2023, 101:21-102:21.

Daria Moore,[24] Kiana Washington-Gauff[25], and Natasha Johnson[26] have so testified concerning their alternative theories of harm, including the existence of an automatic meal deduction that took away 30 minutes of work time when they did not take a break, that are not actually before the Court for possible certification.[27] Nothing in Dr. Petersen's proposed plan would correct for obtaining results related to these differing theories rather than the one at issue in this case.

### *Inability to Remember*

30.     An additional area that highlights the comprehension issues a survey would face is the inability to remember the facts and circumstances that occurred up to six years ago. Numerous deponents testified inaccurately to facts, believed certain policies were in place that were not (such as automatically deducted meal breaks), or just could not remember certain events.

31.     For example, Tanya Charles-Morris testified that she never used a timeclock for meal breaks while she worked for LaPlace and that she only clocked in and out for the day.[28] Ms. Charles-Morris further testified that she regularly worked 12 hours. However, her time records indicate that she worked a maximum of 9.25 hours once during her 22 work days, that she clocked out for meal breaks on 6 of her 22 shifts, and that she averaged only 3.6 hours per shift. Ms. Charles-Morris' memory is thus substantially different from the factual record.[29]

32.     Other examples include Sabena Stevenson, who testified that she does not recall responding to Defendants' Interrogatory Request that she signed April 21, 2023, only six months prior to her deposition.[30] Another is Kiana Washington-Gauff, who does not remember how she recorded her time while at LaPlace.[31] Keyana Marquez similarly stated that she could not recall

---

[24] *Deposition of Daria Moore*, January 4, 2024, 48:6-49:17.
[25] *Deposition of Kiana Washington-Gauff*, September 15, 2023, 90:17-91:7.
[26] *Deposition of Natasha Johnson*, November 1, 2023, 39:21-40:2.
[27] *Order and Reasons*, Doc. 129, July 13, 2022, pp. 5-6.
[28] *Deposition of Tanya Charles-Morris*, January 4, 2024, 40:14-42:12.
[29] Hamm_Ochsner-Acadia_006797-804.
[30] *Deposition of Sabena Stevenson*, October 26, 2023, 49:22-51.24.
[31] *Deposition of Kiana Washington-Gauff*, September 15, 2023, 18:23-25.

events in 2019 because "my memory ain't that good."[32] And Constance Schexnayder testified that she does not recall much regarding meal breaks, as well as failed to remember her answers to Defendants' Interrogatory Request.[33] Other survey respondents are likely to have a similar inability to accurately recall certain facts, or conflate their memory with other places of work. These are all indicators that respondents' memories are likely incomplete and Dr. Petersen's survey testing these memories will not yield reliable information, particularly if those answers are not subjected to scrutiny through a subsequent deposition.

### Misunderstood Questions

33.    In addition to memory issues, it is clear from the review of the depositions that putative class members often misunderstood the questions that were asked in Defendants' Interrogatory Request (*i.e.*, the sorts of questions Dr. Petersen intends to ask in his survey).[34] For example, Joye Wilson replied "Deny" in her interrogatory responses regarding whether she understood that she was supposed to be clocked in for all of the time she spent working.[35] However, in her deposition she changed her answer stating that she knew that she was not supposed to work off the clock, claiming, "[m]aybe I misunderstood the question."[36] Ms. Wilson also appears to have misunderstood a question regarding whether she was able to take a 30-minute meal break without interruptions during more than half the shifts.[37] She stated in her interrogatory response that her meal breaks were interrupted in approximately 50% of her shifts, but in her deposition, she stated that she was never interrupted during a meal break before there were patients at the facility and then never took a meal break at all and thus was actually never interrupted during one. These sorts of misunderstandings can only be identified through deeper examination, *i.e.*, in deposition. A simple survey question can have many interpretations, as seen

---

[32] *Deposition of Keyana Marquez, October 4, 2023,* 82:24-83:5.
[33] *Deposition of Constance Schexnayder*, December 20, 2023, 36:2-6, 37:4-39:21.
[34] *Petersen Report*, p. 9.
[35] *Plaintiff Joye Wilson's Responses to Defendants' First Set of Interrogatories, Requests for Production, and Requests for Admission*.
[36] *Deposition of Joye Wilson*, September 22, 2023, 215:7-216:15.
[37] *Ibid.*, 220:5-221:4.

above, that lead to vastly different conclusions. In this case, Dr. Petersen would treat Ms. Wilson as a 50% interruption response in his survey, whereas, according to her testimony, she was never interrupted during a meal break at all.

34.     Ms. Wilson is not the only person who apparently misinterpreted written questions. Keyana Marquez denied in her written responses that she clocked out and back in for a 30-minute break,[38] but she changed her testimony during her deposition and said that she did clock in and out for breaks.[39] Bettina Schreiner responded that she was owed 30 minutes of pay for every shift she worked,[40] however she testified that she never clocked out for *any* meal period and thus was actually fully compensated for all her time.[41] Dr. Petersen would have treated Ms. Schreiner as a 100% interruption response, when she was not interrupted at all. These examples are but a small handful of the sworn testimony from this case that demonstrate Dr. Petersen's planned survey will not result in reliable information and is likely to provide inaccurate and incorrect results even for the actual survey respondents, let alone the remainder of the proposed Class.

### *Discrepancies Between Deposition and Interrogatory Testimony*

35.     In addition to memory issues and the misinterpretation of questions, a review of the interrogatory responses and deposition testimony shows that putative class members, for whatever reason, simply provided factually incorrect information in their interrogatory responses. For example, Keyana Marquez stated in written responses that she was interrupted during 90% of her meal breaks.[42] However, she testified in her deposition that she would eat lunch in her car approximately twice a week, or between 50-75% of her meal breaks, and she

---

[38] *Plaintiff Keyana Marquez's Responses to Defendants' First Set of Interrogatories, Requests for Production, and Requests for Admission.*
[39] *Deposition of Kiana Washington-Gauff*, September 15, 2023, 78:24-79:12.
[40] *Plaintiff Bettina Schreiner's Responses to Defendants' First Set of Interrogatories, Requests for Production, and Requests for Admission*, Q11.
[41] Deposition of Bettina Schreiner, September 28, 2023, 101:21-102:21.
[42] *Plaintiff Keyana Marquez's Responses to Defendants' First Set of Interrogatories, Requests for Production, and Requests for Admission*.

could not be interrupted when she did so.[43] Therefore, she could only have been interrupted during at most 25-50% of her meal breaks. She also stated that when she worked as a utilization coordinator, she was only interrupted 10-20% of the time. These statements are vastly different from her interrogatory responses, which would likely be similar to any survey response. These discrepancies also highlight the additional issue regarding the changes in behavior over time and across jobs by the same individual.

36.    Other examples of inaccurate written responses include Daria Moore, who claimed she had her 30-minute breaks interrupted on 75% of her shifts,[44] but she clocked out for only 23 meal breaks during her 172 shifts at LaPlace and of those 23 meal breaks, *all of them* were at least 27 minutes—meaning that in an entire year, she did not have a single interrupted meal breaks that could be compensable under Plaintiffs' theory. Similarly, Constance Schexnayder stated that she almost universally did not receive 30-minute uninterrupted meal breaks, but her time clock records show that she clocked out for 16 meal breaks during the 18 shifts she worked for LaPlace (89%) with 11 of those 16 meal breaks (69%) being at least 27 minutes and 13 of those meal breaks (81%) being at least 24 minutes.[45] Bettina Schreiner stated in her interrogatories that meals were automatically deducted,[46] however she recanted that statement in her deposition after being shown her time clock records showing her clocking in and out for meal breaks.[47]

37.    Furthermore, one person, Carmesha Harris, provided responses to Defendants' interrogatory requests claiming to have worked for LaPlace from February to May 2019 as a phlebotomist and to have had 50% of her meal periods interrupted.[48] However, although Ms.

---

[43] *Ibid.,* 49:1-12.
[44] *Plaintiff Daria Moore's Responses to Defendants' First Set of Interrogatories, Requests for Production, and Requests for Admission*.
[45] Hamm_Ochsner-Acadia_007570-1.
[46] *Plaintiff Bettina Schreiner's Responses to Defendants' First Set of Interrogatories, Requests for Production, and Requests for Admission*.
[47] *Deposition of Bettina Schreiner*, September 28, 2023, 100:7-101:9.
[48] *Plaintiff Carmesha Harris' Responses to Defendants' First Set of Interrogatories, Requests for Production, and Requests for Admission*.

Harris accepted a position with LaPlace, *she never actually worked a single shift* and could not have had an interrupted meal break. Dr. Petersen's survey would count her as a 50% interruption response even though she should not be in the Class at all. It is not clear from Dr. Petersen's survey plan how and to what extent he could ensure that only actual class members would respond to his survey. The inclusion of non-class members is inappropriate and would further reduce the validity of any planned survey.

### *Dr. Petersen's Survey Cannot Account for Changes in Behavior Over Time*

38.     Another major shortfall in Dr. Petersen's planned survey is that it cannot account for any differences in meal break practices that occurred because of the specific job, the circumstances around the facility, or the time of day. The interrogatory responses generally provide a single blanket statement regarding alleged interrupted meal breaks, while putative class members testified to significant differences in the occurrence of interrupted meal breaks.

39.     For example, Kiana Washington-Gauff testified that she worked in two different positions while at LaPlace: Intake Coordinator and PRN. She testified during her deposition that her meal breaks as an PRN were not interrupted, whereas her meal breaks were often interrupted when she was an Intake Coordinator.[49] In contrast, her interrogatory responses simply stated that 75% of her meal breaks were interrupted.[50] Not only does this answer not account for the differences she explained during her deposition between her two positions, but her time records as an Intake Coordinator show that of the 105 meal breaks she took during her time as an Intake Coordinator, 92 of those breaks (88%) were at least 27 minutes. Therefore, although she claims 75% of her meal breaks were interrupted, in actuality, less than 12% were interrupted. In addition to the inaccurate information, Dr. Petersen's survey would not capture the changes in her schedule, *i.e.*, working four or five days a week then working one or two days every two weeks, or the changes in her meal break behavior, *i.e.*, not clocking out at all then clocking out

---

[49] *Deposition of Kiana Washington-Gauff*, September 15, 2023, 75:23-77:8.
[50] *Plaintiff Kiana Washington-Gauff's Responses to Defendants' First Set of Interrogatories, Requests for Production, and Requests for Admission.*

for uninterrupted meal breaks. Dr. Petersen would rely on a single number across her employment, which as shown in her testimony and time records would be incorrect. Dr. Petersen's survey will not result in reliable information from Ms. Washington-Gauff's responses.

40.     Another example of this issue is Keyana Marquez, who worked in three different positions while at LaPlace: Intake Coordinator, Utilization Management, and Social Services. Ms. Marquez supplied four different estimates of interrupted meal breaks: 4 out of 10 times in Social Services, 2 or 3 times out of 10 in Utilization Management, 6 out of 10 as a Intake Coordinator during the day, and 5 out of 10 as an Intake Coordinator during the night.[51] Again, Dr. Petersen's survey cannot capture this variation among a single individual much less as it pertains across different class members, and a simple survey would just supply the number of 90% as stated in Ms. Marquez's interrogatory responses, which is clearly incorrect for all of her positions. Dr. Petersen's survey will not result in reliable information from Ms. Marquez's responses.

41.     Joye Wilson also testified that she was able to take her 30-minute uninterrupted meal breaks during the time before LaPlace was accepting patients,[52] whereas she testified that she never took a meal break after LaPlace accepted patients.[53] This testimony illustrates differences in meal break practices over time before and after patients. In contrast, her interrogatory responses state that she was interrupted during 50% of her meal breaks, which again is not true for any point of her employment based on her deposition testimony. The contrasting values among these and other putative Class members show that a simple single number survey question is inadequate to fully characterize the actual experiences of the respondents and will result in unreliable and inaccurate information from which no useful conclusion could be drawn.

---

[51] *Deposition of Keyana Marquez*, October 4, 2023, 72:14-73:22.
[52] *Deposition of Joye Wilson,* September 22, 2023, 117:20-118:8.
[53] *Ibid.,* 96:17-97:21.

###### C.        Dr. Petersen's Sampling Plan is Fatally Flawed

42.        In addition to the inaccuracies of the information that will be obtained from his survey, Dr. Petersen's methodology for his survey is also flawed and would not result in reliable conclusions even if the information obtained was correct. Dr. Petersen proposes to draw a random sample for his pilot sample and the second phase will be to gather as many survey responses as possible from the population. There are two fundamental reasons why this type of protocol is unacceptable to make statistical determinations: (1) it is well-established statistical practice to maintain randomness in a sample selection, which allows statisticians to determine the accuracy of any measurement, and (2) even if random, Dr. Petersen's sample sizes are too small to detect differences if one exists, which creates a false finding of the lack of bias.

### *Statistical Methods Should Not be used with Non-Random Samples*

43.        It is basic statistics that statistical inferences can only be made reliably when a sample is drawn in a random fashion. There are many techniques for sampling, including simple random samples, stratified samples, cluster samples, as well as more complicated hybrid approaches. The basic tenet with these methods is that the probability of selecting a given unit must be known before any sample selection happens. Dr. Petersen claims that he will instruct Davis Research to "obtain forty survey responses through a random sampling process."[54] Although he does not explain what this random process will entail, my experience with Dr. Petersen from other cases is that this "random sampling process" is suspiciously similar to his non-random sampling process.  Specifically, I anticipate that he (or Davis Research) will make outbound calls to some (or all) putative class members and record responses from those who pick up their phone until they reach the desired number of responses. This type of process is anything but random, and it also would not account for the significant variation about different subgroups in the class based on their job, shift, or circumstances at the facility.

44.        The typical methodology would be to select a random set of putative class members and make every effort to contact and obtain responses from those individuals. Rampant

---

[54] *Petersen Report*, p. 34.

substitution of selected units should be avoided to ensure that bias is not an issue. Dr. Petersen

often waves off this criticism because he does not believe bias will exist. That is not only untrue

in my experience, but it is certainly insufficient to *ensure* through an appropriate methodology

that such bias does not exist as would be necessary before relying on any sample to be

representative of a larger group.

45.    "Randomly" calling the entire putative class is identical to trying to obtain a

census of the population, but the respondents are more likely to respond if there is an incentive

for those respondents to respond. In this type of case, there are monetary sums at stake that is a

strong incentive to respond. Dr. Petersen's counter to this is that there may be respondents who

are happy with their work and LaPlace and will respond to help Defendant. That is a noble

thought, but it is extremely unlikely that respondents will spend the time to consider this aspect,

as there is no direct benefit to them. Moreover, the majority of the class will be composed of

former employees, many of whom may just as likely be motivated to hurt Defendant as any

current employee would be to help it. Furthermore, if one took time to consider it, Dr. Petersen's

sampling plan would move quickly on to attempt to contact others. Dr. Petersen's position is that

Defendants should chase down the non-respondents and "prove" bias. Unfortunately, that is not

how good science is done. He, as the survey taker, should be *ensuring* bias does not creep into

his survey, not passing the buck to Defendants to disprove his unproven assumptions.

46.    Adding the non-random second phase to Dr. Petersen's survey would only

exacerbate any potential bias rather than protect against it because he will directly contact the

rest of the putative class. Those with incentives to respond will do so (*i.e.*, those who believe that

they have not been fully compensated for their work), while those without incentives (*i.e.* those

who do not think they have been harmed) will not. Dr. Petersen claims that he will be able to test

for any such bias because of his initial sample, but it is highly likely that he will not find any

because his initial sample was itself biased and is too small to detect large differences, as will be

discussed below.

### *Dr. Petersen's Sample Sizes are Too Small to Detect Large Differences*

47.      Dr. Petersen believes that there will be no bias when comparing his random sample members to his non-random sample members. He plans to rely on statistical comparisons and regression results to establish that bias does not exist between the two groups. Dr. Petersen's sample sizes, however, will be far too low to identify differences between the two groups if a difference actually exists. In fact, Dr. Petersen would only be able to detect differences on the order of approximately 25 percentage points between the two groups. In other words, assuming 30 members in two samples, Dr. Petersen would conclude no difference unless the difference was more than 25 percentage points (*e.g.*, Dr. Petersen would conclude that there is no difference if the two averages were 62% and 38% despite the significant difference). This highlights how statistical measures may not tell the truth when sample sizes are small. Even if Dr. Petersen was able to obtain 80 additional non-random responses for a total sample size of 110, Dr. Petersen would still only be able to detect a difference of 20 percentage points (*i.e.*, Dr. Petersen would conclude no difference exists if the results are 59% compared to 40%). These differences are substantial, but Dr. Petersen's meager sample sizes are insufficient to draw statistical conclusions for them.

48.      Additionally, the record indicates that Dr. Petersen will have a difficult time recruiting survey participants, particularly if he actually follows an appropriate process for randomly selecting them. I understand that 67 individuals initially opted into the collective action, which represents approximately 12% of the putative class at the time notice was sent (67 / 567). That is an initial indicator of the willingness—or rather unwillingness—of putative class members in this class action. Additionally, I understand that 42 of the 67 subsequently refused to cooperate in discovery and were dismissed from the collective action, leaving only 15 members of the collective action or approximately 3% of the putative class.

49.      Given the lack of participation in the collective action, the members of any sample recruited by Dr. Petersen are not going to be representative of the putative class as a whole. It is more likely that disgruntled former employees will have an incentive to respond,

–21–

whereas unharmed employees will have little to no incentive to participate. This self-selection bias is exacerbated by Dr. Petersen's plan to recruit a non-random sample of putative class members.

50. Therefore, any results derived from Dr. Petersen's proposed sampling and survey likely will be biased in Plaintiffs' favor and he will not be able to detect such bias. Dr. Petersen would thus incorrectly conclude that bias did not exist, and his plan's methodology will not result in representative or reliable information.

### D. Dr. Petersen's Sample Size is too Small to Provide Reliable Results Regarding Liability or Damages

51. Dr. Petersen stated that based on the size of the Class (567 members), he would expect a maximum sample size of 110 members, which would obtain an 8.4% margin of error on proportional data.[55] Dr. Petersen also notes, "[t]here is legal precedent that a margin of error of ten percent or less is acceptable in a class action wage and hour case, if damages are to be projected from the average of the survey responses."[56] It is important to state that there is no legal precedent whatsoever of which I am aware to use the average of survey responses to determine ***liability*** across a class regardless of the sample size. Further, as noted above, Dr. Petersen's sample of 110 is extremely ambitious and unlikely to be achieved given the lack of opt-in participation even on the question of damages. If he is only able to obtain his pilot sample size of 40, his results will not meet the threshold he cites even from the *Bell* matter. The maximum margin of error for a sample of 40 is 14.9%, well above the 10% used in *Bell*.

52. Dr. Petersen's analysis will not produce reliable results that can be used to determine either liability or damages in this matter. His margins of error will be significantly larger than what he cites as legal precedent, and even that precedent is suspect and not applicable to this Court. Additionally, his sample will in fact be biased by the way he plans to include non-randomly selected class members.

---

[55] *Petersen Report*, p. 33.
[56] *Ibid.*, p. 31.

**E.    Dr. Petersen's "Gold Standard" Validation is Irrelevant and Incorrect**

53.    Dr. Petersen inexplicably includes a section in his report titled, "An Example of a 'Gold Standard' Validation of a Survey Response Regarding Off-the-Clock Time." This section has nothing to do with any of the topics he was asked to investigate in this case. This matter does not relate to uncompensated productive time, does not relate to agricultural workers, and is not in the same procedural posture as this case. It is irrelevant and unnecessary.

54.    Further, I was the rebuttal expert in that matter, and I provided a lengthy analysis that debunks the idea that Dr. Petersen was successful in performing a "gold standard" validation in that case. Dr. Petersen cherry-picked an apples-to-oranges comparison of times that coincidentally resulted in a similar answer. However, when treating the data consistently across the two sources he compared, the actual difference between the averages is significantly larger than what Dr. Petersen claimed it to be. For example, Dr. Petersen did not use his 'Gold Standard' value of 38.4 minutes in his estimation of damages because there were "outliers" that he eliminated in his damages calculation. Once the "outliers" were removed, the average he calculated was 31.0 minutes. Additionally, Dr. Petersen compared the survey responses, which included a significant number of zero "NPT" times, to the population values that were limited to only non-zero amounts. Had Dr. Petersen included the zeros in the population, the population average (39.2 minutes) would have been substantially lower. Alternatively, if Dr. Petersen had excluded the zero minutes responses, his 'Gold Standard' average would have been substantially larger than the population average. Additionally, Dr. Petersen compared an average of averages from the sample and compared it to an average of all observations from the population. This was not an apples to apples comparison and can have significant effects depending on the length of employment and experience. Thus while Dr. Petersen claims he was able to achieve similar numbers, the reality is that the similarity was at best coincidental and at worst a result misconstruing the results of different populations to reach a desired outcome. There should not be any weight given to a result that was not validly obtained and could not be repeated.

55.    Additionally, when I tried to perform other "gold standard" validations of other questions asked by Dr. Petersen in his survey, none of the survey responses could be corroborated with data that actually existed. For example, Dr. Petersen's survey significantly overstated the percentage of employees who worked piece-rate work when compared to payroll data. Similarly, Dr. Petersen's survey overstated the percentage of employees who worked in multiple locations on the same day when compared to payroll data. Dr. Petersen cherry-picked a single coincidental result to claim a "gold standard" validation, when in fact, it was a result of either randomness or poor analytical work and his method was not only not validated by this process, it was affirmatively shown to be invalid. No significance should be given to this purported "gold standard" validation to find that his proposed methodology here will have any validity or reliability.

56.    Because that case subsequently settled, there was no affirmative finding as to the validity of Dr. Petersen's method. Further, both the court and Plaintiffs' counsel agreed that there is no guarantee that Dr. Petersen's survey in that matter would have been deemed reliable if taken to trial. The court states, quoting plaintiffs' counsel's motion for approval of a class settlement, "there is certainly risk associated with litigating to trial a random sample survey conducted by plaintiffs' expert, and whether a trier of fact would accept the survey and the conclusions drawn from the survey as reliable evidence of damages."[57] Nothing about Dr. Petersen's survey methodology or analysis was approved by the court for the determination of class-wide damages—let alone the issue of liability that he seeks to use it for here.

## VI.    CONCLUSION

57.    Dr. Petersen's proposed sampling and survey plan will not lead to valid or reliable information that would assist the trier-of-fact in drawing any conclusions about the putative Class. First, Dr. Petersen's proposed survey plan cannot support a finding of liability on a class-

---

[57] *Order Granting Motion for Final Approval of Class Action Settlement and Granting Motion for Attorneys' Fees, Costs, and Incentive Award, Beatriz Aldapa, et al., v. Fowler Packing Company, Inc.*, No. 1:15-cv-00420-ADA-SAB, 2023 U.S. Dist. LEXIS 98344, *13 (E.D. Cal. June 5, 2023) (citing Plaintiffs' motion for final approval of class action settlement).

wide basis at all. Moreover, unless the claims at issue are appropriate for class treatment—which Dr. Petersen simply assumes but discovery indicates is not true—a sampling survey cannot provide valid results for determining damages across the class.

58.     Second, the testimony and written discovery responses provided by various putative class members indicates that the information obtained from the survey will be inaccurate and unreliable. As shown by comparing the deposition testimony and time clock records with the written responses from FLSA opt-in plaintiffs there will be significant comprehension issues, lapses in memory, and otherwise false answers that Dr. Petersen will not be able to avoid or correct for with a simple survey.

59.     Third, Dr. Petersen's survey cannot overcome the significant variances among the proposed members of the Class based on shift time, shift length, and time period. Dr. Petersen's methodology does not, nor can it, account for any of these differences among the various positions, shifts, or time periods. The small sample size set forth by Dr. Petersen is woefully inadequate to statistically identify differences across these characteristics.

60.     Fourth, Dr. Petersen's survey plan is methodologically unsound because he proposes a non-random sampling plan for a portion of the responses. Further, even if the answers to his survey questions were accurate and reliable—which they would not be—both his non-random respondent selection process and small proposed sample sizes—that he is nevertheless unlikely to obtain—would be unable to detect substantial variances between his survey results and actual meal break interruptions shown by deposition testimony and time clock records, which are likely to exist.

61.     Finally, Dr. Petersen's "Gold Standard" Validation section regarding an unrelated lawsuit is irrelevant to this case and does nothing to validate his approach here. His claimed "validation" was not found to be such in that case, and was reached through cherry-picking data and using an unreliable methodology. Moreover, a fair analysis of other disparate responses from that same survey show that the result was in fact invalid.

I declare under the penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 25th day of March, 2024 in Los Angeles, California.

_____

Joseph A. Krock, Ph.D.

# Exhibit A

# Joseph A. Krock, Ph.D.
Managing Director





**Los Angeles, CA USA**
**Office:** +1.213.784.3079
jkrock@stout.com

## Education

Ph.D., Economics, University of Chicago

M.A., Economics, University of Chicago

B. A., Economics – Mathematics,
University of California, Santa Barbara

## Practice Areas

Economics Consulting
Complex Business Litigation
Investigations

Joseph A. Krock, Ph.D., is a Managing Director in the Disputes, Claims, & Investigations group. He is among the country's leading experts in wage and hour class action litigation and has been retained by numerous clients in nationwide class and collective actions. Additionally, he provides consulting and expert witness testimony services for antitrust, consumer class action, breach of contract, and complex commercial litigation matters. Dr. Krock provides economic and statistical analyses, including econometrics, risk analysis, and sampling and survey design.

As an expert economic and statistical witness, Dr. Krock has provided written and oral testimony in matters pending before the U.S. District Courts in California, District of Columbia, Illinois, Minnesota, Nevada, New Jersey, New York, Oregon, and Texas, the Superior Court of the State of California, the Circuit Court of Florida, the Circuit Court of Illinois, the Civil District Court of Louisiana, the Circuit Court of Missouri, and Circuit Court of Wisconsin, as well as Federal Multi-District Litigation matters.  He also participates in private arbitration and mediation matters, and assists clients with corporate decision-making.

In his wage and hour practice, Dr. Krock regularly provides economic examination including the review and evaluation of employment data and estimates on liability exposure.  He designs, executes, and analyzes samples and surveys; reviews, verifies, and tabulates claims information; and provides expert testimony.  Additionally, Dr. Krock provides support for labor and employment class action litigation and general commercial litigation by collecting, managing, and analyzing complex data.

Dr. Krock has provided testimony in over 80 class and collective action matters related to wage and hour, consumer products, consumer credit, civil rights, Americans with Disabilities Act, privacy, and qui tam.  Of these, he has provided testimony regarding the appropriateness of class treatment and trial plans in more than 40 matters. His testimony has been cited by trial and appellate courts to substantiate his client's position.

Prior to joining Stout, Dr. Krock held senior positions at The Claro Group, Micronomics, Inc. and Deloitte & Touche. He also served as a lecturer in Economic Theory at University of Chicago.

### Professional Memberships

- American Bar Association, Associate Member
- American Economics Association, Member
- National Association of Business Economists, Member
- Los Angeles County Bar Association, Associate Member
    - o   Litigation Section, Labor and Employment Section
- Loyola High School – Alumni Association
- St. Lawrence Martyr Parish Finance Council, Chairman

# Joseph A. Krock, Ph.D.
Managing Director



---

## Fields of Concentration

Labor and Employment, Antitrust, Damages Calculation, Econometrics, Statistical Analysis, Surveys and Sampling, Valuation, Risk Analysis, Complex Data Management and Analysis

## Select Consulting Experience

### Labor and Employment

Retained as economic and statistical expert for state and federal labor and employment cases

Developed and implemented sampling strategies for large state and federal wage and hour class actions

Assisted counsel in creating interview and deposition scripts regarding labor and employment issues

Managed large employment-related databases and determined class eligibility for numerous state and federal labor and employment class actions

Performed statistical and econometric analyses related to labor and employment issues

Assessed past and ongoing exposure regarding potential wage and hour issues to assist executives in corporate decision-making

### Class and Collective Actions

Provided analysis and expert testimony regarding the economic and statistical appropriateness of proposed class action trial plans

Prepared evaluations of random sample survey plans

Executed random sample surveys regarding damages calculations

Performed post-trial damages calculations, including processing, reporting, and advising on claims-made damages

Evaluated economic exposure associated with putative class claims for numerous clients across a wide range of industries

**Consumer Products -** Performed statistical analyses to determine whether and to what extent various product characteristics are valued by consumers

**Consumer Products -** Performed analyses to determine whether and to what extent alleged product failures could be remedied under product warranties

**Consumer Credit -** Evaluated the effect of negative credit reporting on the cost and ability to obtain consumer credit

---

**Investment Banking & Restructuring** | **Transaction Advisory** | **Valuation Advisory** | **Disputes, Claims, & Investigations**

**stout.com**

2

# Joseph A. Krock, Ph.D.
Managing Director



---

**ADA -** Performed statistical analyses related to the compliance of retail establishments with regard to various ADA standards

**Illinois Right to Privacy Act -** Evaluated whether social media data could be used to reliably identify potential violations of the IRPA

**Civil Rights -** Evaluated various data regarding criminal defendants being held as incompetent to stand trial and the ability of the mental health system to treat those patients

**Civil Rights -** Performed economic analysis regarding the potential impact of food trucks on brick-and-mortar restaurants related to elements of city ordinances

## Statistical Analysis

**Pharmaceutical Industry -** Analyzed patterns of breakthrough bleeding and spotting for various formulations of oral contraceptives

**Labor Class Action -** Performed statistical analysis to ascertain whether response rates in a class action claims process were representative of the whole class

**Discrimination -** Reviewed data and prepared an econometric analysis of government agricultural lending practices in a lending discrimination matter

**Discrimination -** Analyzed reduction-in-force data for age discrimination claims

Directed sampling and review of documents to determine extent of duplication in document production

Assisted clients with sampling, survey design, and hypothesis testing

## Econometrics

**Antitrust -** Performed econometric analysis of antitrust pass-through damages in connection with indirect purchaser antitrust matter

**Antitrust -–** Performed econometric analysis of sales migration across fuel pricing territories

**Pharmaceutical Industry -** Estimated own- and cross-price elasticity of demand for pharmaceuticals

**Labor Class Actions -** Analyzed differences among groups of potential class members in labor and employment matters using econometric and statistical techniques

**Discrimination -** Reviewed data and prepared an econometric analysis of government agricultural lending practices for a lending discrimination matter

Employed event study methodology in connection with securities fraud, intellectual property, and breach of contract matters

---

# Joseph A. Krock, Ph.D.
Managing Director



Prepared and evaluated revenue and earnings forecasts on behalf of plaintiffs and defendants involved in commercial litigation

Assisted clients with survey design, sampling, and hypothesis testing

## Economic Damages / Lost Profits

**Commercial Litigation -** Calculated lost profits and economic damages on behalf of plaintiffs and defendants in connection with contract disputes, fraud, business interruption, and other causes of action  Addressed lost sales, incremental costs, capacity, and mitigation

**Breach of Contract/Non-Compete -** Performed damages calculation for alleged breach of contract claims associated with non-compete covenant, including lost profits and tortious interference aspects

**Real Estate -** Valued real estate and other assets lost as a result of wrongful conduct

**Wrongful Death -** Calculated lost wages and benefits in connection with wrongful death and personal injury matters

Determined lost sales and lost profits as a result of alleged wrongful conduct and breach of contract

## Antitrust

Prepared econometric analyses in direct purchaser and indirect purchaser price fixing antitrust matters

Conducted studies of market definition, below-cost pricing, price discrimination, and economic damages on behalf of plaintiffs and defendants involved with antitrust litigation

## Consumer Class Action

Evaluated appropriateness of class treatment for large consumer class action

Analyzed and rebutted plaintiffs' class-wide damages model for alleged false advertising claims

Analyzed economic value of injunctive relief related to consumer credit class action

## Risk Analysis

Assisted law firms, corporate legal departments, and mediators with assessments of litigation risk and the expected value of litigation

Analyzed risk associated with litigation versus settlement in insurance claim disputes on behalf of insurers and insured parties

## Healthcare

Performed billing review for a regional hospital to assess potential exposure for Medicare billing non-compliance issues

## Joseph A. Krock, Ph.D.
Managing Director



Built comprehensive Medicare billing database to assist a client in the re-pricing of Medicare billings for services provided to correct for reimbursement rates under OPPS, APC, and the Physician Fee Schedule, which were incorrectly billed

Created and analyzed comprehensive payroll and timekeeping database for multi-facility health system to assist with class certification issues

Performed statistical sampling and analyses related to alleged billing irregularities

### Valuation

**Sports -** Developed model for valuing NFL franchises and studied impact of stadium construction and naming rights on franchise value

**Insolvency -** Analyzed value of a proposed reorganized entity seeking to emerge from Chapter 11 bankruptcy

Determined actual and but-for market capitalization in connection with wrongful conduct and breach of contract matters

Performed option valuation calculations in connection with wrongful conduct and breach of contract matters

# Joseph A. Krock, Ph.D.
Managing Director



## TESTIMONY/EXPERT REPORTS/MEDIATION

1. Doctors Emergency Service, P.A. v. Professional Management, Inc., and AdvantEdge Healthcare Solutions, Inc.
   Circuit Court for Baltimore City Maryland
   Case No. 24-C-23-001840
   Medical Billing Dispute
   Report

2. Sabino Marquez v. Danell Custom Harvesting
   Superior Court of California, County of Kings
   Case No. 21C-0284
   Wage & Hour
   Report

3. Jimmy Herrera, et al., v. Flowers Baking Co. of Modesto, et al.
   U.S. District Court, Eastern District of California
   Case No. 2:21-CV-02217
   Wage & Hour
   Deposition, Report

4. Anjali Joshi, v. Altruist Corp.
   JAMS
   Case No. 5220000821
   Wrongful Termination, Disability Discrimination
   Arbitration, Deposition

5. Gustavo Mora, et al., v. C.E. Enterprises, et al.
   Superior Court of California, County of Ventura
   Case No. 56-2018-00521275
   Wage & Hour
   Trial, Deposition

6. Vista Santa Rosa, Inc., et al., v. Division of Labor Standards Enforcement
   Superior Court of California, County of Riverside
   Case No. PSC1806608
   Wage & Hour
   Trial

7. Daniel Ludlow, et al., v. Flowers Foods, Inc., et al.
   U.S. District Court, Southern District of California
   Case No. 18-CV-1190
   Wage & Hour
   Report

# Joseph A. Krock, Ph.D.
Managing Director



8.  Selena Staley, et al., v. FSR International Hotel Inc. d/b/a Four Seasons
    Hotels and Resorts, et al.
    U.S. District Court, Southern District of New York
    Case No. 22-cv-6781
    WARN Act Dispute
    Report

9.  Marisol Gomez, et al., v. J Jacobo Farm Labor Contractor, Inc.
    U.S. District Court, Eastern District of California
    Case No. 1:15-cv-01489
    Wage & Hour
    Report

10. Jarrod Johnson, et al., v. 3M Company, et al.
    U.S. District Court, Northern District of Georgia
    Case No. 4:20-cv-0008-AT
    City of Rome, v. 3M Company, et al.
    Superior Court of Georgia, Floyd County
    Case No. 19-cv-02405-3
    Environmental Dispute
    Deposition, Report

11. Shannon Carpenter, et al., v. McDonald's Corporation
    U.S. District Court, Northern District of Illinois
    Case No. 21-cv-02906
    Illinois Biometric Information Privacy Act
    Report

12. Troy Willis, et al., v. Koning & Associates, et al.
    U.S. District Court, Northern District of California
    Case No. 5:21-cv-00819-BLF
    Wage & Hour
    Report

13. Leah Snyder, v. Alight Solutions, LLC
    U.S. District Court, Central District of California
    Case No. 8:21-CV-00187
    Wrongful Termination
    Report

14. Jeremy Mason, et al., v. Lion Raisins, Inc.
    Superior Court of California, County of Fresno
    Case No. 15CDECG00733
    Wage & Hour
    Report

**Joseph A. Krock, Ph.D.**
Managing Director



15. Edwin Minassian v. Toughbuilt Industries, Inc. and Michael Panosian
Superior Court of California, County of Los Angeles
Case No. EC065533
Breach of Contract
Deposition

16. GM Financial, Americredit Financial Services, Inc., v. Nicole M. Bell
Circuit Court of Missouri, County of St. Louis
Case No. 15SL-AC24506-01
Consumer Credit Class Action
Report

17. Simeon Hunter, v. Rivian Automotive, LLC
American Arbitration Association
Case No. 01-20-0015-8379
Wrongful Termination
Report

18. Rickey Henry, et al., v. Central Freight Lines, Inc.
U.S. District Court, Eastern District of California
Case No. 2:16-CV-00280
Wage & Hour
Report

19. Roger Flores, et al., v. Element Materials Technology Huntington Beach
LLC
Superior Court of California, County of Los Angeles
Case No. 18STCV10074
Wage & Hour
Report

20. Norma Espino, et al., v. Sky Chefs, Inc.
Superior Court of California, County of Los Angeles
Case No. 19STCV44265
Wage & Hour
Report

21. Julian Vargas, et al., v. Quest Diagnostics, Inc.
U.S. District Court, Central District of California
Case No. 2:19-CV-08108
ADA Violations
Deposition, Report

22. Alvaro Lopez Cabrera, et al., v. South Valley Almond Company, LLC
U.S. District Court, Eastern District of California
Case No. 1:21-CV-00748-AWI-JLT
Wage & Hour
Report

**Joseph A. Krock, Ph.D.**
Managing Director



23.  Fabian Gonzalez, et al., v. HUB International Midwest, LTD
     Superior Court of California, County of San Bernardino
     Case No. CIVDS1900463
     Wage & Hour
     Report

24.  Ethan Noyer, v. AEROTEK, Inc., and GM Cruise Holdings
     JAMS
     Case No. 1100108393
     Wrongful Termination, Disability Discrimination
     Arbitration, Deposition, Report

25.  Mark Luna, et al., v. Penske Logistics, LLC
     U.S. District Court, Eastern District of California
     Case No. 2:21-cv-00081
     Wage & Hour
     Report

26.  Roosevelt Luckett, v. McDonald's Restaurants of California, Inc.
     Superior Court of California, County of Los Angeles
     Case No. 20STCV05066
     Wage & Hour
     Report

27.  Michell Fernandez, et al., v. Suburban Propane LP
     Superior Court of California, County of Fresno
     Case No. 16CECG00418
     Wage & Hour
     Report

28.  Alfred Johnson, et al., v. WinCo Foods, LLC and WinCo Holdings, Inc.
     U.S. District Court, Central District of California
     Case No. 5:17-cv-02288
     Wage & Hour Wage & Hour
     Report

29.  Kevin Edwards v. Ecolab, Inc.
     American Arbitration Association
     Case No. 01-19-0000-6486
     Wage & Hour
     Report

30.  Tessema Estifanos v. Ecolab, Inc.
     American Arbitration Association
     Case No. 01-19-0000-6487
     Wage & Hour
     Report

**Joseph A. Krock, Ph.D.**
Managing Director



31.    Richard Grinesey-Miller v. Ecolab, Inc.
       American Arbitration Association
       Case No. 01-19-0000-6488
       Wage & Hour
       Report

32.    Marc Grozinger v. Ecolab, Inc.
       American Arbitration Association
       Case No. 01-19-0000-6489
       Wage & Hour
       Report

33.    Alex Luevano v. Ecolab, Inc.
       American Arbitration Association
       Case No. 01-19-0000-6490
       Wage & Hour
       Report

34.    Angel Zamora, et al., v. Penske Truck Leasing Co.
       U.S. District Court, Central District of California
       Case No. 2:20-cv-2503
       Wage & Hour
       Report

35.    Omero Torres, v. Ecolab, Inc.
       American Arbitration Association
       Case No. 01-19-0000-6469
       Wage & Hour
       Arbitration, Report

36.    Patrick Kinney, v. Ecolab, Inc.
       American Arbitration Association
       Case No. 01-19-0000-6468
       Wage & Hour
       Arbitration, Report

37.    Andrew Anderson, v. Ecolab, Inc.
       American Arbitration Association
       Case No. 01-19-0000-6465
       Wage & Hour
       Arbitration, Report

38.    Rudy Garcia, v. Ecolab, Inc.
       American Arbitration Association
       Case No. 01-19-0000-6478
       Wage & Hour
       Arbitration, Report

**Investment Banking & Restructuring** | **Transaction Advisory** | **Valuation Advisory** | **Disputes, Claims, & Investigations**

**stout.com**                                                                                                    10

**Joseph A. Krock, Ph.D.**
Managing Director



39. Robert Blakeley, v. Ecolab, Inc.
American Arbitration Association
Case No. 01-19-0000-6476
Wage & Hour
Arbitration, Report

40. Joe Azevedo, v. Ecolab, Inc.
American Arbitration Association
Case No. 01-19-0000-6474
Wage & Hour
Arbitration, Report

41. Stacy Bauman, v. Ecolab, Inc.
American Arbitration Association
Case No. 01-19-0000-6475
Wage & Hour
Arbitration, Report

42. Pamela Rubin-Knudsen, et al., v. Arthur J. Gallagher & Co.
U.S. District Court, Central District of California
Case No. 2:18-cv-6227
Wage & Hour
Report

43. Kristal Nucci, et al., v. Rite Aid Corp., et al.
U.S. District Court, Central District of California
Case No. 19-cv-01434
Wage & Hour
Report

44. Rina Acosta, et al., v. Remington Lodging & Hospitality, LLC
Superior Court of California, County of Contra Costa
Case No. 016-02404
Wage & Hour
Report

45. Jasmine Estrada, v. Paletz and Agatstein Urology Medical Group, Inc.
Superior Court of California, County of Los Angeles
Case No. 18STCV03003
Discrimination, Wage & Hour
Report

46. Mark Brewer, v. Ecolab, Inc.
American Arbitration Association
Case No. 01-19-0000-1056
Wage & Hour
Arbitration, Report

## Joseph A. Krock, Ph.D.
Managing Director



47.  Morgena Carter and Cornelia Brandon, v. Telecare Corp.
     U.S. District Court, Central District of California
     Case No. 2:18-cv-10748
     Wrongful Termination, Discrimination
     Deposition, Report

48.  Stephen Craig, v. Ecolab, Inc.
     American Arbitration Association
     Case No. 01-19-0000-1058
     Wage & Hour
     Arbitration, Report

49.  Maria Vecchio, et al., v. Quest Diagnostics Inc., et al.
     U.S. District Court, Southern District of New York
     Case No. 1:16-cv-05165
     Wage & Hour
     Deposition, Report

50.  Lloyd T. Briggs III, et al., v. OS Restaurants Services, LLC, et al.
     U.S. District Court, Central District of California
     Case No. 2:18-cv-08457-JAK-AFM
     Wage & Hour
     Report

51.  Elizabeth Khaled, v. Library Systems & Services, LLC
     Superior Court of California, County of Riverside
     Case No. RIC1903238
     Wage & Hour
     Report

52.  Eduardo Chavez, v. Smurfit Kappa North America LLC
     U.S. District Court, Central District of California
     Case No. 2:18-cv-05106
     Wage & Hour
     Report

53.  William Sario, v. California Rail Builders, LLC, et al.
     Superior Court of California, County of Los Angeles
     Case No. BC679635
     Wrongful Termination
     Trial, Deposition

54.  Robert Bankwitz, v. Ecolab, Inc.
     American Arbitration Association
     Case No. 01-18-0003-2812
     Wage & Hour
     Arbitration, Report

**Investment Banking & Restructuring** | **Transaction Advisory** | **Valuation Advisory** | **Disputes, Claims, & Investigations**

**stout.com**

12

**Joseph A. Krock, Ph.D.**
Managing Director



55.  Matthew Bruers, v. Flowers Foods, Inc., et al.
     U.S. District Court, Central District of California
     Case No. 18-cv-01442-JLS-ADS
     Wage & Hour
     Report

56.  William Jacobo, v. Ecolab, Inc.
     American Arbitration Association
     Case No. 01-18-0003-2797
     Wage & Hour
     Arbitration, Deposition, Report

57.  Todd Bedingfield, Jack Hall, v. American International Group, Inc.
     U.S. District Court, Central District of California
     Case No. 2:18-cv-04249-DSF-AFM
     Wrongful Termination, Age Discrimination
     Report

58.  Farah, et al., v. Claim Jumper Restaurants, Inc., et al.
     Superior Court of California, County of Los Angeles
     Case No. BC583679
     Wage & Hour
     Report

59.  United States of America and State of New York, ex rel. Edward Lacey, v.
     Visiting Nurse Service of New York
     U.S. District Court, Southern District of New York
     Case No. 14-cv-5739
     False Claims Act
     Deposition, Report

60.  Simon Goro, et al., v. Flowers Foods, Inc.
     U.S. District Court, Southern District of California
     Case No. 17-cv-02580
     Wage & Hour
     Deposition, Report

61.  Anne de Lacour, et al., v. Colgate-Palmolive Co.
     U.S. District Court, Southern District of New York
     Case No. 1:16-cv-08364
     Consumer Class Action
     Deposition, Report

62.  Kenneth Hernandez, et al., v. AutoZone, Inc.
     U.S. District Court, Eastern District of New York
     Case No. 1:15-cv-05593
     ADA Violations
     Report

**Investment Banking & Restructuring** | **Transaction Advisory** | **Valuation Advisory** | **Disputes, Claims, & Investigations**

**stout.com**

13

**Joseph A. Krock, Ph.D.**
Managing Director



63.  Scott Reising, v. Western Alliance Bank
     ADR Arbitration
     ADR Case No. 13-7830
     Wrongful Termination
     Arbitration, Deposition

64.  Alma Gomez, v. Henry Mayo Newhall Memorial Hospital
     Superior Court of California, County of Los Angeles
     Case No. BC511293
     Wrongful Termination
     Deposition

65.  Victor Zepeda, et al., v. Wonderful Citrus Packing LLC
     Superior Court of California, County of Kern
     Case No. S-1500-CV-282439
     Wage & Hour
     Deposition, Report

66.  Christine Dancel, et al., v. Groupon, Inc.
     U.S. District Court, Northern District of Illinois
     Case No. 1:18-cv-02027
     Illinois Right to Privacy Act
     Deposition, Report

67.  Ismael Sanchez Ruiz, et al., v. Daniel C. Salas Harvesting, Inc.
     Superior Court of California, County of Kings
     Case No. 16 C0214
     Wage & Hour
     Report

68.  Stephanie Stiavetti, et al., v. Pamela Ahlin, et al.
     Superior Court of California, County of Alameda
     Case No. RG15779731
     Civil Rights
     Report

69.  Miguel Valadez, et al., v. CSX Intermodal Terminals, Inc.
     U.S. District Court, Northern District of California
     Case No. 3:15-cv-05433-EDL
     Wage & Hour
     Report

70.  Jeffrey Johnston, et al., v. Schiff Nutrition International and Reckitt
     Benckiser
     U.S. District Court, Northern District of California
     Case No. 3:15-cv-03669-PH
     Consumer Class Action
     Report

---

**Joseph A. Krock, Ph.D.**
Managing Director



71. Maria Del Carmen Acosta, et al., v. Bee Sweet Citrus, Inc., et al.
    Superior Court of California, County of Fresno
    Case No. 16-CECG-01253
    Wage & Hour
    Report

72. Patrick E. Runyon, et al., v. Bostik, Inc., et al.
    U.S. District Court, Central District of California
    Case No. 5:16-cv-2413
    Products Liability, Consumer Class Action
    Report

73. Beatriz Aldapa, et al., v. Fowler Packing Company, Inc., et al.
    U.S. District Court, Eastern District of California
    Case No. 1:15-CV-00420
    Wage & Hour
    Report

74. Manuel de Luna, et al., v. Pacific Rim Dairy, et al.
    Superior Court of California, County of Kings
    Case No. 14C0070
    Wage & Hour
    Report

75. Cynthia Arroyo v. CERES, Inc.
    Superior Court of California, County of Ventura
    Case No. 56-2015-00475199
    Wage & Hour
    Report

76. Talbert Mitchell v. SEIU Local 721, et al.
    Superior Court of California, County of Los Angeles
    Case No. BC575572
    Discrimination, Wrongful Termination
    Trial, Deposition

77. Vegas Holding Corp, et al., v. Geoffrey Knapp
    Superior Court of California, County of Orange
    Case No. 30-2012-00551681
    Fraud, Breach of Contract
    Deposition

78. Alicia Rogan, et al., v. Montage Hotels & Resorts, LLC
    Judicial Arbitration and Mediation Services
    JAMS Ref. No. 1200051035
    Wage & Hour
    Report

# Joseph A. Krock, Ph.D.
Managing Director



79. Kevin Woodruff, et al., v. Broadspectrum Downstream Services, Inc.
U.S. District Court, Northern District of California
Case No. 3:14-cv-04105
Wage & Hour
Deposition, Report

80. Audrey Pena, Naila Zavala, et al., v. Sea World, LLC
Superior Court of California, County of San Diego
Case No. 37-2013-00081715
Wage & Hour
Report

81. Giovanni Martinez, et al., v. Flowers Foods, Inc., et al.
U.S. District Court, Central District of California
Case No. 2:15-cv-5112
Wage & Hour
Report

82. KIPP v. Lukin & Associates, Inc., et al.
Superior Court of California, County of Los Angeles
Case No. NC053503
Contract Dispute
Trial, Deposition

83. 3M Company, v. ACE Bermuda Insurance, Ltd.
London Courts of International Arbitration
Insurance Dispute
Report

84. Miguel Sanchez, et al., v. CHLN, Inc.
Superior Court of California, County of Los Angeles
Case No. BC532190
Wage & Hour
Report

85. Juan Uribe, et al., v. Total Transportation Services, Inc.
Superior Court of California, County of Los Angeles
Case No. NC059374
Wage & Hour
Report

86. In Re: Morgan Stanley Smith Barney LLC Wage and Hour Litigation
U.S. District Court, District of New Jersey
MDL 2280, Master Case No. 11-cv-3121
Wage & Hour
Report, Deposition

**Joseph A. Krock, Ph.D.**
Managing Director



87.  LMP Services, Inc., v. City of Chicago, IL
     Circuit Court of Cook County, Illinois
     Case No. 2012 CH 41235
     Civil Rights
     Report, Deposition

88.  Victor Almaraz, et al., v. American Residential Services
     Superior Court of California, County of Los Angeles
     Case No. 37-2015-00006918-CU-OE-CTL
     Wage & Hour
     Report

89.  M&I Bank FSB, v. Old Republic Insurance Company, Guaranty Bank, F.S.B.,
     and GB Reit Corporation
     Guaranty Bank, F.S.B., v. Old Republic Insurance Company
     Circuit Court of Wisconsin, County of Milwaukee
     Case No. 09-CV-7648 & 09-CV-13592
     Insurance Dispute
     Report

90.  Barbara Rivard-Crook, et al., v. Accelerated Payment Technologies, Inc., et
     al..
     U.S. District Court, District of Nevada
     Case No. 2:10-cv-02215-MMD-GWF
     Breach of Contract
     Deposition, Report

91.  Lovco Construction, Inc., v. W. A. Rasic Construction, Inc.
     Superior Court of California, County of Los Angeles
     Case No. NC057835
     Tortious Interference
     Trial, Deposition

92.  Barr Segal v. TCW Group, Inc., and Marc Stern
     Judicial Arbitration and Mediation Service
     Arbitration Ref. No. 1220045625
     Wrongful Termination, Age Discrimination
     Arbitration, Deposition

93.  Donovan Long, David Horn, et al., v. Stanley Black & Decker, Inc., et al.
     U.S. District Court, Southern District of California
     Case No. 3:14-cv-01246-JLS-BGS
     Wage & Hour
     Report

**Joseph A. Krock, Ph.D.**
Managing Director



94. Chelly Bergstrom, et al., v. Circle K Stores, Inc.
    Superior Court of California, County of Riverside
    Case No. RIC 1206463
    Wage & Hour
    Report

95. Pablo Amado, et al., v. ServiceMaster Global Holdings, Inc., et al.
    Judicial Arbitration Mediation Service
    Arbitration Ref. No. 1100073286
    Wage & Hour
    Report

96. Scarlet Keshishzadeh, et al., v. Zurich American Insurance Company
    Superior Court of California, County of Los Angeles
    Case No. BC516292
    Wage & Hour
    Report

97. Sabas Arredondo, et al., v. Delano Farms Company, et al.
    U.S. District Court, Eastern District of California
    Case No. 1:09-cv-01247-MJS
    Wage & Hour
    Report

98. Claudia DeSilva, et al., v. North Shore-Long Island Jewish Health System
    Inc., et al.
    U.S. District Court, Eastern District of New York
    Case No. 2:10-cv-1341-JFB-ETB
    Wage & Hour
    Report

99. Patrick Bellinghausen, et al., v. Tractor Supply Company
    Superior Court of California, County of Alameda
    Case No. RG13677135
    Wage & Hour
    Report

100. Scott Nance, Frederick Freedman, et al., v. May Trucking Co.
    U.S. District Court, District of Oregon – Portland Division
    Case No. 3:12-cv-01655-HZ
    Wage & Hour
    Deposition, Report

101. Benjamin Nilsson, Michael Meeks, et al, v. Longs Drug Stores, LLC
    Superior Court of California, County of Santa Barbara
    Case No. 1304153
    Wage & Hour
    Deposition, Report

## Joseph A. Krock, Ph.D.
Managing Director



102. Lisa Garvey, et al., v. Kmart Corp.
U.S. District Court, Northern District of California
Case No. 11-2575
Wage & Hour
Report

103. Shane Simmons, et al., v. Valspar Corp.
U.S. District Court, District of Minnesota
Case No. 10-3026 RHK/SER
Wage & Hour
Deposition, Report

104. Emerita V. Chavez, et al., v. Angelica Textile Services, Inc.
Superior Court of California, County of San Diego
Case No. 37-2010-00086997-CU-OE-CTL
Wage & Hour
Deposition, Report

105. Simon V. Garcia, et al., v. Gordon Trucking, Inc., et al.
U.S. District Court, Eastern District of California – Fresno Division
Case No. 1:10-cv-00324-OWW-SKO
Wage & Hour
Deposition, Report

106. Susan Gayle Holt, et al., v. K Mart Corporation
Superior Court of California, County of San Francisco
Case No. CGC-10-496141
Wage & Hour
Report

107. Bay Point Oil Corp., et al., v. Motiva Enterprises LLC, et al.
Hollywood Hills Servicecenter, Inc., et al., v. Motiva Enterprises LLC, et al.
Circuit Court of Florida, County of Miami-Dade
Case Nos. 03-03572 CA 30 and 04-13857 CA 30
Antitrust
Deposition

108. William Dailey, et al., v. Sears, Roebuck and Co.
Superior Court of California, County of San Diego
Case No. 37-2009-00054168-CU-OE-NC
Wage & Hour
Report

109. Edward Arciniega, v. D.R. Horton, Inc., et al.
American Arbitration Association Case No. 72 160 00321 10
Case No. 72 160 00321 10
Wrongful Termination
Arbitration, Deposition

**Investment Banking & Restructuring** | **Transaction Advisory** | **Valuation Advisory** | **Disputes, Claims, & Investigations**

**stout.com**

19

## Joseph A. Krock, Ph.D.
Managing Director



110. Richard B. Melbye, v. Accelerated Payment Technologies, Inc.
U.S. District Court, Southern District of California
No. 3:10-cv-IEG-JMA
Breach of Contract
Trial, Deposition, Report

111. Shaunetta Eddings, et al., v. Health Net, Inc., et al.
U.S. District Court, Central District of California
No. CV10-1744 JST
Wage & Hour
Deposition, Report

112. Jose Jimenez v. Sears, Roebuck & Co.
Superior Court of California, County of Los Angeles
Case No. BC 383006
Wage & Hour
Deposition, Report

113. Spencer De La Cruz, v. Abercrombie & Fitch Co., et al.
Superior Court of California, County of Orange
Case No. 30-2007-00036240
Wage & Hour
Deposition, Report

114. Clarke and Rebecca Wixon, et al., v. Wyndham Resort Development Corp.,
et al.
U.S. District Court, Northern District of California
No. C 07-02361 JSW
Breach of Contract
Report

115. Maisah Muhammad, et al., v. Bare Escentuals, Inc.
Superior Court of California, County of Los Angeles
Case No. BC 405569
Wage & Hour
Deposition, Report

116. Kim McBride, et al., v. Jenny Craig, Inc., et al.
U.S. District Court, Southern District of California
No. 07CV2382 JLS (AJB)
Wage & Hour
Report

117. Hans J. Rapold, v. Baxter International, Inc.
U.S. District Court, Northern District of Illinois
No. 08CV7369
Breach of Contract
Report

**Joseph A. Krock, Ph.D.**
Managing Director



118.  Daynna Wood, et al., v. Vie-Del Company
      Superior Court of California, County of Fresno
      Case No. 08CECG01289
      Wage & Hour
      Report

119.  Thomas La Parne, et al., v. Monex Deposit Company, et al.
      U.S. District Court, Central District of California
      No. SACV-08-302 DOC (MLGx)
      Wage & Hour
      Deposition, Report

120.  The Administrators of the Tulane Educational Fund v. Marsh USA, Inc., et
      al.
      Civil District Court For The Parish of Orleans, State of Louisiana
      Case No. 2006-09555
      Insurance Dispute
      Report

121.  Allison L. Knox v. Dynamic Nursing Services, Inc.
      Superior Court of California, County of Los Angeles
      Case No. BC 360621
      Wage & Hour
      Trial, Report

122.  Judith A. Smith v. IHOP Corp.
      Superior Court of California, County of Los Angeles
      Case No. BC 382940
      Age Discrimination
      Report

123.  Bich D. Nguyen v. Computer Sciences Corporation, et al.
      Superior Court of California, County of Los Angeles
      Case No. BC 358617
      Age Discrimination
      Deposition

124.  Equilon Enterprises LLC v. Nikrad Enterprises, Inc.
      U.S. District Court, Central District of California
      No. CV-07-2562 ABC
      Antitrust, Breach of Contract
      Report

125.  Ruben Pablo, et al., v. ServiceMaster Global Holdings, Inc., et al.
      U.S. District Court, Northern District of California
      No. 3:08-CV-03894
      Wage & Hour
      Report

**Joseph A. Krock, Ph.D.**
Managing Director



126. Holly Walker, Carol Paradise, et al., v. Bankers Life & Casualty Co.
U.S. District Court, Northern District of Illinois
No. CV 06906
Wage & Hour
Deposition, Report

127. Cynthia Fernandez, et al., v. Victoria's Secret Stores, Inc.
U.S. District Court, Central District of California
No. CV 06-4149 MMM (SHx)
Wage & Hour
Report

128. In re Terminix Employment Practices Litigation
U.S. District Court, Northern District of California
MDL Docket No. 1809
Wage & Hour
Report, Mediation

129. Shiloh Hood, et al., v. Terminix International Co., L.P.
Superior Court of California, County of Alameda
Case No. RG 05245029
Wage & Hour
Report, Mediation

130. Christopher Roy, et al., v. Terminix International Co., L.P.
Superior Court of California, County of San Bernardino
Case No. SCVSS 140622
Wage & Hour
Report, Mediation

131. Derain Clark, Maxine Gaines, et al., v. American Residential Services, L.L.C.
Superior Court of California, County of Los Angeles
Case No. BC 332632
Wage & Hour
Report, Mediation

132. Janice Millius, et al., v. Los Angeles Unified School District
Superior Court of California, County of Los Angeles
Case No. BC 325763
Wage & Hour
Mediation

133. Ortho-McNeil Pharmaceutical Inc., et al., v. Barr Laboratories, Inc.
U.S. District Court, District of New Jersey
No. 2:03-CV-04678-SRC-CCC
Patent Infringement
Deposition, Report

**Joseph A. Krock, Ph.D.**
Managing Director



134. Micrel, Inc., v. Deloitte & Touch, L.L.P.
Superior Court of California, County of Santa Clara
Case No. 1-03-CV-816477
Professional Negligence
Deposition, Report

135. In re Farmers Insurance Exchange Claims Representatives' Overtime Pay
Litigation
U.S. District Court, District of Oregon
MDL Docket No. 1439
Wage & Hour
Report

136. Paula Chase, et al., v. Farmers Insurance Exchange, et al.
District Court of Colorado, City and County of Denver
Case No. 01CV4773
Wage & Hour
Report

137. Mark Severn, et al., v. Farmers Insurance Exchange, et al.
Circuit Court of Michigan, County of Oakland
Case No. 2001-035558-CZ
Wage & Hour
Report

138. Gary J. Milner, et al., v. Farmers Insurance Exchange, et al.
District Court of Minnesota, County of Hennepin
Case No. 01-15004
Wage & Hour
Report

139. Robert Salcido, et al., v. Farmers Insurance Exchange, et al.
District Court of New Mexico, County of Albuquerque
Case No. 202-CV-200106330
Wage & Hour
Report

140. Robert C. Westcott, et al., v. Farmers Insurance Exchange
U.S. District Court, District of Oregon
No. 3:01-1105
Wage & Hour
Report

141. Robert B. Dietz, et al., v. Farmers Insurance Exchange Co., Inc.
Superior Court of Washington, County of Snohomish
Case No. 01-2-07091-4
Wage & Hour
Report

**Joseph A. Krock, Ph.D.**
Managing Director



142.  Jennifer Petre v. Farmers Insurance Exchange, et al.
      Superior Court of Washington, County of King
      Case No. 01-2-21799-2
      Wage & Hour
      Report

143.  Rose M. Bell, et al., v. Farmers Insurance Exchange
      Superior Court of California, County of Alameda
      Case No. 774013-0
      Wage & Hour
      Report, Mediation

144.  Guadalupe L. Garcia, Jr., et al., v. Ann Veneman
      U.S. District Court, District of Columbia
      No. 1:00CV02945
      Lending Discrimination
      Report

145.  Raymond Verdin, et al., v. R&B Falcon Drilling USA, Inc., et al.
      U.S. District Court, Southern District of Texas
      No. G-00-488
      Antitrust
      Report

146.  Inter-Tel, Inc., v. Bank of America
      Superior Court of Arizona, County of Maricopa
      Case No. CV 96-00867
      Breach of Contract, Wrongful Conduct
      Arbitration

# Joseph A. Krock, Ph.D.
Managing Director



## PUBLICATIONS & PRESENTATIONS

- "Damages at Class Certification," (with Kiley Grombacher, Bradley/Grombacher), MCLE Presentation, Bridgeport Continuing Education, Certifying Class Actions: Navigating the Legal Landscape, Webinar, June 2, 2023.

- "Damages & Penalties in Exemption and Misclassification Cases," (with Robert Drexler, Capstone Law, and Bradley Hamburger, Gibson Dunn), MCLE Presentation, Bridgeport Continuing Education, Independent Contractor, Joint Employment Misclassification Litigation 2019, Los Angeles, California, July 12, 2019.

- "Practical/Discovery Data Management Issues Facing In-House HR" (with Andrew J. Cook, Ph.D.), 14th Annual Labor and Employment Law Advanced Practices Symposium, Las Vegas, Nevada, April 11, 2018.

- "An In-Depth Examination of Class Certification Featuring a Close Look at Daubert Considerations," (with David Scheidemantle, Scheidemantle Law Group, and Andre Mura, Gibbs Law Group), MCLE Presentation, Bridgeport Continuing Education, 2018 Consumer Class Action Litigation Conference, Costa Mesa, California, January 19, 2018.

- "A Careful Look at Spokeo and Its Meaning in Wage & Hour Litigation," (with Christina Humphrey, Humphrey & Rist, and Timothy Long, Orrick), MCLE Presentation, Bridgeport Continuing Education, 2017 Wage & Hour Litigation and Management, Los Angeles, California, December 8, 2017.

- "When and How to Use Experts" & "Live Deposition and Trial Demonstration: Economists," (with MiRi Song, Paul Hastings, and Phil Horowitz, Law Office of Phil Horowitz), MCLE Presentation, The State Bar of California Program on Using Expert Witnesses to Win Employment Cases, San Francisco, California, August 10, 2017.

- "Practical/Discovery Data Management Issues Facing In-House HR," (with Andrew Cook, The Claro Group, and Kathy Perkins, Kathy Perkins LLC), 13th Annual Labor and Employment Law Advanced Practices Symposium, Las Vegas, Nevada, March 29, 2017.

- "Tips on Damages Analysis for Mediation and Settlement," (with Christina Humphrey, Humphrey & Rist), MCLE Presentation, Bridgeport Continuing Education, 2016 Wage & Hour Litigation and Management, Los Angeles, California, December 9, 2016.

- "Changing Standards for Class Certification: Experts and Statistical Sampling in Light of Spokeo and Tyson," (with Rachel R. Brass, Gibson Dunn; E. Michelle Drake, Berger & Montague, P.C.; and Vandy M. Howell, Ph.D., Cornerstone Research), MCLE Presentation, Bridgeport Continuing Education, 2016 Class Action Litigation Conference, San Francisco, California, September 16, 2016.

- "How to Leverage Your Company's Data to Prevent and Win Employment Lawsuits," (with Andrew Cook, The Claro Group), 12th Annual Labor and Employment Law Advanced Practices Symposium, Las Vegas, Nevada, March 16, 2016.

- "Consumer Class Action Claims: Give Peace a Chance," (with Dan Cunningham, Tressler, LLP; David Nelson, Barnes & Thornburg, LLP; and Brad Seiling, Manatt), MCLE Presentation, Emerging and Complex Insurance Claims Forum 2016, Los Angeles, California, February 25, 2016.

# Joseph A. Krock, Ph.D.
Managing Director



- "Bell to Duran: The Evolution of the Use of Sampling & Statistics in Wage & Hour Litigation & A Brief Primer on the California Fair Pay Act," (with Andrew Cook), MCLE Presentation, Carothers DiSante & Freudenberger, Irvine, California, October 16, 2015.

- "Bell to Duran: The Evolution of the Use of Sampling & Statistics in Wage & Hour Litigation," (with Andrew Cook and Christopher Paskach), MCLE Presentation, Morrison & Foerster, Los Angeles, California, May 27, 2015.

- "Data Analytics in Discovery – Structured and Unstructured ESI," (with Christopher Paskach), CPE Presentation, OC-ACFE, Irvine, California, March 19, 2015.

- "The Use of Experts in the Certification Phase of Class Litigation," (with Mark Campbell, Loeb & Loeb, and Graham LippSmith, Girardi|Keese), MCLE Presentation, Bridgeport Continuing Education, 2013 Class Action Litigation & Management Conference, Los Angeles, California, April 11, 2013.

- "New Rules for the Use of Statistical Evidence in Wage & Hour Cases,", MCLE Presentation, Bridgeport Continuing Education Conference on Wage & Hour Litigation, San Diego, California, June 15, 2012.

- "Damage Modeling in Wage and Hour Class Actions Including Lost Income & PAGA Penalties," (with Fraser A. McAlpine, Hunton & Williams), MCLE Presentation, Bridgeport Continuing Education Conference on Wage & Hour Litigation, San Francisco, California, October 14, 2011.

- "Damage Modeling in Wage and Hour Class Actions," (with Daniel Chammas, Venable, and Steven Pearl, The Pearl Law Firm), MCLE Presentation, Bridgeport Continuing Education Conference on Wage & Hour Litigation, Los Angeles, California, December 16, 2010.

- "Calculating Damages at Class Certification: Effect of New Class Certification Standards on Calculation of Damages," (with Miranda Kolbe, Schubert Jonckheer & Kolbe), MCLE Presentation, Bridgeport Continuing Education Conference on Class Action Litigation, San Francisco, California, August 13, 2010.

- "Approaches to Calculating, Proving and Arguing Monetary Relief," (with T. Blood, Blood Hurst & O'Reardon, and G. Knopp, Akin Gump), MCLE Presentation, Bridgeport Continuing Education Conference on Class Action Litigation, Los Angeles, California, April 23, 2010.

- "Approaches to Calculating, Proving and Arguing Damages," (with D. Barclay Edmundson, Orrick), MCLE Presentation, Bridgeport Continuing Education Conference on Class Action Litigation, Los Angeles, California, April 30, 2009.

- "Effective Use of Experts in Employment Litigation," MCLE Presentation, Bridgeport Continuing Education Conference on Trial Preparation for Employment Litigation, San Diego, California, January 28, 2009.

- "Approaches to Calculating and Proving Damages," MCLE Presentation, Bridgeport Continuing Education Conference on Wage & Hour Litigation, Los Angeles, California, December 3, 2008.

- "Approaches to Calculating and Proving Damages," MCLE Presentation, Bridgeport Continuing Education Conference on Wage & Hour Litigation, San Diego, California, June 13, 2008.

## Joseph A. Krock, Ph.D.
Managing Director



- "Working With Experts: The SET Approach," (with Gary Holmen, Farmers Insurance), ACC Docket, May 2008.

- "Efficient Management of Data in Class Action Litigation," (with Jean Nicole Taylor Moore, Micronomics), California Litigation, Volume 21, Number 1, 2008.

- "Efficient Management of Data in Wage & Hour Class Actions," MCLE Presentation, Bridgeport Continuing Education Conference on Wage & Hour Litigation, Sacramento, California, March 6, 2008.

- "Managing Experts," MCLE Presentation, TroyGould, Los Angeles, California, February 28, 2008.

- "Sampling Class Action," (with Stevan Porter, Micronomics), The Los Angeles Daily Journal, January 7, 2008.

- "Statistics: Sampling, Descriptive Statistics and Regression," (with Stevan Porter), MCLE Presentation, Davis Wright Tremaine, Los Angeles, California, September 19, 2007.

- "Efficient Discovery and Management of Data in Wage and Hour Litigation," (with Karen Santos, Micronomics), MCLE Presentation, The Quisenberry Law Firm, Los Angeles, California, July 10, 2007.

# Exhibit B

**HAMM v. ACADIA LAPLACE HOLDINGS, LLC**
**EXHIBIT B: LIST OF MATERIALS RELIED UPON**

| Documents |
|---|

1. [Docket No. 202] Acadia Hamm - Second Amended Complaint(224674383.1).pdf
2. 04.28.2023 Certificate of Service for Discovery Responses.pdf
3. 04.28.2023 Plaintiffs' Omnibus Objections to Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
4. 05.17.2023 Plaintiffs' Omnibus Objections to Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
5. 05.30.2023 Plaintiffs Carr, Abbate, Boudoin, and Charles-Morris' Verified Responses to Defendants First Set of Interrogatories, Requests for Production, and Requests for Admissions.pdf
6. 06.07.2023 Plaintiff Maggie Rogers' Responses to Defendant's First Set of Interrogatories and Requests for Production.pdf
7. 06.14.2023 Plaintiff Ebonie Jones' Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents.pdf
8. 07.05.2023 Plaintiff Erin Forney's Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents.pdf
9. 07.05.2023 Plaintiffs' Omnibus Objections to Responses to Defendant's First Set if Interrogatories, Requests for Production and Requests for Admissions.pdf
10. Amy Hamm 01-24-2022_full.pdf
11. Bettina Schreiner 09-28-2023_full.pdf
12. Bettina Schreiner's Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
13. Carmesha Harris' Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
14. Cassandra Bailey 10-10-2023_full.pdf
15. Cassandra Bailey's Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
16. Constance Schexnayder 12-20-2023_full.pdf
17. Constance Schexnayder's Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
18. Darria Dwanette Moore 01-04-2024_full.pdf
19. DE 270 - MOTION FOR CLASS CERTIFICATION.pdf
20. DE 274 - DEFENDANTS' MOTION TO DECERTIFY THE COLLECTIVE ACTION.pdf
21. DE 287 - RESPONSE MEMORANDUM in Opposition filed by Amy Hamm.pdf
22. DE 292 - DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR RULE 23 CLASS CERTIFICATION.pdf
23. DE 295 - Plaintiff's Reply in Support of Motion for Class Certification.pdf
24. DE 297 - DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DECERTIFY THE COLLECTIVE ACTION.pdf
25. Declaration of Erica Lewis.pdf
26. Declaration of Jolandra Tate.pdf
27. Declaration of Kyla Clark.pdf
28. Eshantti Smith-Trask's Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
29. Freddie Jones' Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
30. Hamm (LA) - Roger's Responses to Ds' Depostion by Written Questions 240209.pdf
31. Hamm Payroll Records Compiled.pdf
32. HAMM, AMY EXHIBIT.pdf
33. Joy Wilson's Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
34. Joye Wilson 09-22-2023_full.pdf
35. Julia Johnson 12-27-2023_full.pdf
36. Keyana Marquez 10-04-2023_full.pdf
37. Keyana Marquez's Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
38. Kiana Washington-Gauff Full Transcript 14032TRA5-2TRN.pdf
39. Kiana Washington-Gauff's Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
40. Michelle Joseph's Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
41. Nadia Hart's Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
42. Nadia Monquie Hart 09-12-2023_full.pdf
43. Natasha Johnson 11-01-2023_full.pdf
44. Natasha Johnson's Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
45. Nichelle Akins' Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
46. Nichelle Denise Akins 01-03-2024_full.pdf
47. PDF - FULL SIZE - ERICA LEWIS.pdf
48. PDF - FULL SIZE - JOLANDRA TATE.pdf
49. PDF - FULL SIZE - KENYA FREDERICKS.pdf
50. PDF - FULL SIZE - KYLA CLARK.pdf
51. Phylicia Reid's Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
52. Quincy Barnett's Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
53. REGINA JOSEPH - PDF - FULL SIZE - LINKED EXHIBITS -.pdf
54. Remaining 46 Opt-in Plaintiffs' Responses to Defendants' First Set of Interrogatories, Requests for Production, and Requests for Admissions.pdf
55. Rest and Meal Breaks - HR 320.pdf
56. Rule 26(a)(2)(B) Report of J. Peterson, Ph. D. 240208.pdf
57. Sabena Stevenson 10-26-23_full.pdf
58. Sabena Stevenson's Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
59. Shaleah Ferrygood's Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
60. Shawnell Stockman's Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
61. Shawntell M. Stockman 10-05-2023_full.pdf
62. Tanya Tennielle Charles-Morris 01-04-2024_full.pdf
63. Time Records for Whole Class.pdf
64. Tracy Cook's Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
65. Wilbert _Wilnishia_ Marcell's Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf
66. Winnesha Harrison's Responses to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admissions.pdf